Laramore, Judge,
delivered the opinion of the court:
Plaintiff, a prime contractor with the Corps of Engineers, seeks to recover damages it incurred because of a work stoppage of 38 days brought about by picket lines established by certain labor unions around the Plattsburgh Air Force Base, Plattsburgh, New York, the work site of the contract here in issue. Plaintiff contends that the Government is liable for damages under either Article GC-10[1] of the contract, Article GC-11[2] of the contract, or because of an alleged breach of the contract by defendant. The alleged breach is that the Government was responsible for the work stoppage *148 because it utilized civilian personnel in the operation of two boilers in the central heating plant while two additional boilers were being constructed by plaintiff’s subcontractor.
Both plaintiff and defendant rely on the facts as recited by the Armed Services Board of Contract Appeals in its decision of March 16, 1960. The Board’s recital of facts is long and elaborate, but since neither side seem to agree on what was stated by the Board, said facts are hereinafter set forth in detail as the facts upon which plaintiff and defendant base their respective motions for summary judgment.
“Appellant’s two contracts were part of the program for the construction of Plattsburgh Air Force Base, which is located on the shore of Lake Champlain near Plattsburgh, New York, about 26 miles from the Canadian border. The ‘old’ part of the Air Base on the lake side of U.S. Highway No. 9 had formerly been Army Barracks, but at the end of World War II it had been made available for civilian use, and it was being occupied by Champlain College when this site was selected for a Base of the Strategic Air Command in the early 1950’s. From several standpoints it was a Base of unusual importance, and its construction at the earliest possible date was considered of the utmost importance to national defense. The construction program for the Air Base included the renovation of the old facilities and the construction of many new facilities on the other side of Route 9. This appeal relates to the new construction part of the Base only. Plans called for the construction of the Base, the manufacture of bombers and the training of Air Force personnel simultaneously and for the activation of the Base in the summer of 1955, such activation to be piecemeal as the various new facilities became completed to the point where they were usable.
“The Army Corps of Engineers was designated as the ‘construction agency’ to construct Plattsburgh Air Force Base for the Strategic Air Command (SAC) of the Air Force as ‘using agency’. Contracts for the construction of the Base were awarded and administered by the crops of Engineers through its New York District, which came under the jurisdiction of the North Atlantic Division. The District Engineer, New York District, was the contracting officer for the *149 contracts, and be was assisted in the administration of the contracts by the Resident Engineer and his staff at Platts-burgh. The project was financed with Air Force construction funds that were allocated to the Corps of Engineers by the Air Force. The Air Force had an Air Force Installations Representative (AFIR) who spent more than 60 percent of his time on the project during the construction of the Base, and there was constant liaison between the Corps of Engineers as construction agency and the Air Force as using-agency. Before completion of the construction program the Base was activated and came under the command of a Base Commander. The Air F orce chain of command was from the Base Commander through Headquarters, Eighth Air Force, Wes to ver Air Force Base, Massachusetts, to Headquarters, United States Air Force (Hq., USAF) in Washington, D.C. On some matters relating to the construction program there was direct communication between the AFIR and the office of the Assistant Chief of Staff, Installations, USAF, in Washington.
“The basic policies and fundamental concepts of responsibilities under which the Corps of Engineers performed construction for the Air Force are set out in a joint Army-Navy-Air Force regulation entitled ‘Construction, Air Force contract Construction’ numbered AR 415-11 and AFR 88-3. Such regulation makes the Air Force responsible for ‘surveillance’ of the construction work, which includes on-the-site observation or inquiry by the AFIR without duplication of the functions of inspection and contract administration which are the responsibilities of the construction agent.
“Air Force Regulation 88-9 dated 31 August 1954, as amended on 6 December 1954, entitled ‘New Construction, Transfer and Acceptance of Facilities Constructed for the Air Force’, established the Air Force policy, procedures and responsibilities in the transfer and acceptance of real estate facilities constructed for the Air Force. Pertinent provisions of such regulation are as follows:
“ ‘4. Transfer Document. Department of the Army ENG Form 290, “Transfer of Construction,” 1 April 1952, is authorized and will be used in all instances for *150 the transfer of facilities constructed for the Air Force. * * *
“ '5. Types of Acceptance. The extent of acceptance of facilities by the Air Force will be governed by the conditions attendant to the transfer. Determinations as to the extent of acceptance involved and appropriate procedures to be followed will be based on the following-classifications :
“‘a. Accountability Acceptance. Accountability acceptance establishes complete ownership of the facilities by the Air Force and custody, by the using agency under Air Force jurisdiction. Facilities will be accepted for Air Force accountability when determination has been made that the construction is in accordance with the contract plans and specifications and construction deficiencies, observed during the transfer inspection and listed on the ENG Form 290, have been corrected or a certification placed on the form by the construction agency, or the contractor when the work is performed under an Air Force contractj acknowledging the validity of the deficiencies and assuring correction as an integral part of the contract. Accountability acceptance will be evidenced by the signature of the appropriate installations commander and installations engineer on the ENG Form 290.
“ ‘b. Conditional Acceptance. When a satisfactory agreement cannot be reached with the construction agency as to the validity and correction of deficiencies considered to be a part of the construction contract, the AFIR will determine whether the facilities -will be accepted by the using agency on a conditional basis. Upon reaching a satisfactory agreement the facilities will be accepted for accountability of the Air Force as outlined in “a” above.
“ ‘c. Beneficial occupancy. Beneficial occupancy constitutes a use of facilities, or portions of facilities, by Air Force personnel after the facilities have been completed to the point where they are capable of accommodating their assigned mission but not completed to the level required by the plans and specifications. Air Force policies, procedures in the negotiation of agreements, and responsibilites relative to beneficial occupancy use of facilities are contained in AFR 85-17.’
“It will be noted that paragraph 5c, AFR 88-9, refers to AFR 85-17 for policies and procedure on ‘beneficial occupancy.’ The latter regulation dated 30 July 1952 and *151 amended 1 April 1953 is entitled ‘Installations — General, Beneficial Occupancy’. Pertinent provisions are as follows:
“ ‘2. Policy. The extent to which Air Force personnel and organizations are assigned to use real estate and real property facilities under beneficial occupancy agreements will be held to a minimum and will be governed by the following prime considerations:
“ ‘a. Urgency of the need for the real estate and facilities in the continuance or support of the using command.
“ ‘b. Capability of facilities to meet shelter and operational requirements.
“ ‘c. The degree of caretaking and protection responsibilities which must be assumed by the Air Force.
“ ‘3. Definitions. For the purpose of this Regulation, the following definitions of beneficial occupancy will apply.
❖ * * # *
“‘b. New Construction. Occupancy for use of real property facilities prior to physical completion or formal acceptance of the facilities from the construction agency or contractor by the Air Force. (NOTE: Newly constructed facilities used under beneficial occupancy agreements usually provide only minimum shelter and operational needs which will be progressively completed to the requirement level of the plans and specifications before being formally accepted by the Air Force.)
“ ‘4. Procedure. Occupancy and use of real estate and real property facilities by Air Force personnel and organizations prior to conclusion of agreements, acquisition proceedings, or completion of construction will be subject to the following actions:
‡ ‡ ‡ ‡ ‡
“‘b. New Construction. The date on which Air Force personnel or organizations may occupy and use any real property facilities, or portions of facilities, prior to completion of construction will be determined jointly by the major air commander who will assume jurisdiction of the facilities when formally accepted by the Department of the Air Force, the chief of the construction agency or his authorized representative, and the appropriate Air Force installations representative.
“ ‘5. Agreements. The major air commander who will assume jurisdiction of real estate and real property facilities, which are under negotiation for lease or acquisition, will establish by agreement with the *152 Chief of Engineers, Department of the Army, or his authorized representative, the conditions under which Air Force personnel and organizations are to be assigned for beneficial occupancy pending formal acceptance by the Air Force upon completion of negotiated agreements or acquisition proceedings. Similar agreements will be made with the chief of the construction agency or his authorized representative, or the contractor when construction is performed by the major air command, for beneficial occupancy of real property facilities being constructed for the Air Force. The major air command concerned will be responsible for coordinating the availability of funds, personnel, supplies, equipment, and the facilities in determining an occupancy and use date.
“ '6. Prohibitions. The following prohibitions pertain to beneficial occupancy and use of real estate and real property facilities by Air Force personnel and organizations:
^ ^
“ 'b. Construction. Newly constructed facilities will not be formally accepted from a construction agency or from the contractor for Air Force accountability until the facilities have been inspected by Air Force representatives as provided by AFB, 85-5, and
“ '(1) Approved for full compliance with the terms and requirements of the contract, or
'' '(2) An agreement has been made which legally binds the contractor to complete the facilities and/or correct the deficiencies, noted at the time of beneficial occupancy, to comply fully with the terms and requirements of the contract without additional charge to the Government.
'' 'c. Use of Fwids and Resources. Funds and resources specifically authorized for construction will not be augmented by any other appropriated funds or resources of the Air Force for work which is to be performed by the construction agency and contractor as a part of the construction contract, or which is over and above the standards established by the construction directive. Likewise, funds and resources specifically authorized for rehabilitation and alteration of leased facilities will not be augmented by any other appropriated funds or resources of the Air Force.’
“The first Plattsburgh Air Force Base contract awarded to appellant was Contract No. DA 30-075-ENG-6009 dated 22 January 1954 for 167 items of building and utility con *153 struction at a total contract price of $8,705,448. Item 8 was the construction of a Base Maintenance Shop at a price of $450,000.
“Item 10 was the construction of a Central Heating Plant at a price of $1,000,000. The Central Heating Plant was to provide heat for all the new buildings being constructed at the Base, including the buildings being constructed by other contractors as well as the buildings constructed by appellant. It was a modern type of high pressure circulating hot water system whereby water under high pressure was heated to 375° F by boilers in a central plant and circulated to the various buildings to provide radiant heating by means of pipes in the floors. A principal part of the central heating system was the boilers which were fired by fuel oil. The system included also the oil burners, feed water system, water softening equipment, pumps, valves, other auxiliaries, and the distribution system. One feature of the system was the automatic controls to be operated electrically. The central heating plant covered by appellant’s contract included two boilers which were to be housed in a building to be constructed by appellant having sufficient space for four boilers, as it was contemplated that the heating plant would be expanded as additional buildings were constructed.
“Contract No. 6009 specified various completion dates for the items to be constructed thereunder, ranging from 181 days to 615 days after receipt of Notice to Proceed. It provided for completion of the Central Heating Plant within 585 days after Notice to Proceed, which established the original completion date of the Central Heating Plant as 9' September 1955.
“Contract No. 6009 contains the standard provisions customarily included in lump sum military construction contracts, including the standard “Changes,” “Termination for Default — -Damages for Delay — Time Extensions,” “Disputes,” “Materials and Workmanship,” “Permits and Responsibility for Work, Etc.,” “Notice to the Government of Labor Disputes,” “GC-8. Protection of Material and Work,” and “GC-9 Protection of Existing Structures, Utilities, *154 Work and Vegetation.” The two clauses of the contract on which appellant bases its claim are quoted as follows:
“‘GC-10 POSSESSION PRIOR TO COMPLETION: The Government shall have the right to take possession of or use any completed or partially completed part of the work. Such possession or use shall not be deemed an acceptance of any work not completed in accordance with the contract. If such prior possession or use by the Government delays the progress of the work or causes additional expense to the Contractor, an equitable adjustment in the contract price and/or the time of completion will be made and the contract will be modified in writing according * * *
“ ‘GC-11. SUSPENSION OF WORK: The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government, unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed for the Contractor, provided however, that the suspension was not due to the fault or negligence of the Contractor. Provided, further, that no suspension will be ordered or adjustments made under this paragraph for delays arising as the result of changes ordered or as the result of changed conditions encountered under the respective articles relating to Changes and Changed Conditions or as the result of any delays for such an extension of time as may be granted under the Delays-Damages Article of this contract.’
“At the same time that appellant was performing Contract No. 6009 other contractors were constructing buildings at Plattsburgh Air Force Base which were a part of the same construction program as Contract No. 6009, and the Central Heating Plant being constructed by appellant was designed to provide heat for the buildings being con *155 structed by other contractors as a part of the same construction program. Among the buildings being constructed by other contractors were dormitories and mess halls for the accommodation of troops. Before the Base could be activated and troops brought in, the dormitories and mess halls had to be ready for use and provided with heat from the Central Heating Plant.
“Contract No. DA 30-075-ENG-6581, the other contract involved in this appeal, is dated 31 January 1955 and provides for the construction of additional buildings and utilities at a contract price of $5,208,298.85. Unlike Contract No. 6009 which was a part of the Air Force FY 1953 construction program, Contract No. 6581 was a part of the Air Force FY 1955 construction program and cited FY 1955 funds for payment. It contained the same standard provisions as Contract No. 6009.
“The additional buildings to be constructed under the FY 1955 program required an addition of two boilers to the Central Heating Plant to provide heat for the increment of buildings, and in view of the urgency of the project, it was necessary that work on the two additional boilers be started before the work on the original heating plant was completed. Ordinarily the two additional boilers would have been covered by a new contract placed by advertising for bids, but since boilers 3 and 4 had to be started before boilers 1 and 2 were completed and it was not feasible to have two contractors working simultaneously on the same heating plant, the contracting officer obtained authority to contract for the two additional boilers by negotiating a modification of Contract No. 6009. The two boilers were added to the work under such contract by Modification No. 9 dated 12 April 1955 increasing the price in the amount of $599,875 and extending the completion date of the heating plant 90 days, but without any change in the completion date of boilers 1 and 2.
“In the construction of a large project it is customary for the Corps of Engineers to enter into construction contracts with general contractors who is turn subcontract portions of the work to specialty contractors. The building and construction industry has the tradition of being highly organ *156 ized by the building trades unions which, are among the strongest in the American labor movement. Although the construction industry is essentially local in character, the local unions are organized into nationals and internationals, and the national unions in the AFL-CIO are banded together at the national level in a building and construction trades department. The construction contractors likewise are organized into a variety of national associations. Since the construction industry is highly organized on a national basis on both sides, the result is that, although collective bargaining agreements are negotiated locally and apply only to the particular area, such agreements have a standardized form with standard “boilerplate” clauses. A construction contractor or subcontractor does not have access to the local pool of skilled union labor unless it enters into or becomes a party to a standard form of local collective bargaining agreement with the various union locals which represent the various crafts from which it draws labor.
“The building trades unions are strong in New York State, and all the construction contractors and subcontractors performing work at the Plattsburgh Air Force Base site employed exclusively union labor. Qualified non-union labor was not available in the area. The Government Trial Attorney makes the point that appellant did not inform the Government of either the existence or the terms of any labor agreement applicable to appellant or its subcontractor. Such a contention ignores the fact that the Corps of Engineers was thoroughly sophisticated in the labor practices and labor relations problems of the contraction industry. Although the Corps of Engineers followed the policy of attempting to insulate itself from any direct dealings with the labor unions by requiring that all such dealings be between the union and the contractor, it had labor relations advisers who interested themselves in the problem when an actual or potential labor dispute threatened to delay performance of a contract. One of the standard provisions of construction contracts, including appellant’s contracts, is the ‘Notice to the Government of Labor Disputes’ clause which requires that the contractor notify the contracting officer whenever an actual or potential labor dispute threat *157 ens to delay timely performance of the contract. It was unnecessary for appellant to give the contracting officer specific information as to the existence and terms of the applicable standard form collective bargaining agreements when the Corps of Engineers was already so well acquainted with the labor practices of the industry.
“Appellant subcontracted the construction of the Central Heating Plant to Frederick Naff Company, Inc., (hereinafter referred to as ‘Naff’), which was a firm skilled and experienced in the construction of heating plants with automatic equipment. Naff became a party or participant in standard form collective bargaining agreements with the union locals representing the various crafts of labor required for the construction of the heating plant, including the electricians’, the operating engineers’ and the plumbers’ and steamfitters’ unions.
“An example of such a collective bargaining agreement is the agreement between ‘the Plumbing and Pleating Contractors in the city of Plattsburg, N.Y.,’ as Party of the First Part, and ‘Local #497 Affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada,’ as Party of the Second Part. Although Naff did not affix its signature to the written document, it accepted and became a party to or participant in the agreement. Pertinent provisions of the agreement are as follows:
“ ‘Preamble
“ ‘Whereas, the Party of the First Part is engaged in the Plumbing and Heating and Pipe Fitting work in the Jurisdiction of the Party of the Second Part and in the performance of such work require the service of competent and qualified Journeymen of the United Association and,
“ ‘Whereas, the Party of the Second Part is affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, of the American Federation of Labor, and has in its membership throughout the United States and Canada, Journeymen competent and qualified to perform work coming within its Jurisdiction of work, and
*158 “ ‘Whereas, the Parties hereto desire to establish uniform hours of Labor and uniform working conditions for the Journeymen and Apprentices of the Party of the Second Part, as a National guide or form under which they are to be employed by the Party of the First Part, and further, to encourage closer cooperation and better understanding between employer and employee of the Plumbing, Heating and Pipe Fitting Industry to the end that a satisfactory continuous and harmonious labor relationship will exist between both Parties to this agreement.
‡ ‡ * * ‡
“ ' Article I, Scope
“ ‘A — * * * It is the duty of the Parties to this Agreement to enforce the conditions set forth hereunder and any violation will be subject to discipline through the Joint Arbitration Board or Umpire hereinafter provided for.
“ ‘B — Local members of the Party of the First Part hereby Agrees to “Run a UNION SHOP” under wages and working conditions as hereinafter outlined.
“ ‘C — In order to avoid jurisdictional controversies with other Trades, the Party of the Second Part will insist that the Party of the First Part procure and embrace in their job contracts and specifications all of the piping, fixtures, appurtenances and appliances that are necessary to make a complete Plumbing or Pipe Fitting installation, coming under the United Association jurisdiction of work.
“ ‘D — It is further agreed that the Party of the First Part will include in their contracts maintenance of all temporary heating of all installations until the job has been finally completed. That hours of labor on temporary heat will be as follows: During the working day, mechanics on the job will maintain temporary heat. At nite one mechanic will work from 6:00 PM until midnight then another mechanic from midnight until 6:00 AM. These hours shall be worked at straight time. On Saturday and Sunday the following time schedule will be kept in reference to the maintenance of temporary heat: One mechanic will work from 8:00 AM Saturday to 4:00 PM, then another mechanic will work from 8:00 PM. Saturday until 4:00 AM Sunday. Another mechanic shall then work from 8:00 AM Sunday until 4:00 AM Monday. This is a total of 46 hours a week for temporary heat maintenance which may be worked at *159 straight time. All hours above 46 per week must be paid at double time.
* * * S: *
“ ' Article V — Assignment of men
“‘It is understood that the Party of the First Part will use members of the Party of the Second Part on all work coming under the jurisdiction of the United Association of Journeymen Plumbers and Steam Fitters of the United States and Canada, subject to the following regulations:
* * ü: * ❖
“ ‘1. Inasmuch as the Labor-Management Relations Act, 1947, has denied the right of the Union effectively to discipline a member who is an employee of a Company for violation of the Union’s constitution and by-laws, and has removed the Union’s right, even if said member was declared not to be in good standing because of misconduct, to require the Company to suspend or discharge such employee, thus effectively hampering the Union’s ability to carry out the Provisions of this agreement.
“ '2. IT IS STIPULATED AND AGREED that the Union, its officers, agents and members shall not be held, liable in any manner whatsoever for any strike, slowdown, work stoppage or any other form of action which results in delay or stoppage of work or production; nor will the Union be held liable for the unauthorized acts or activities of its officers, agents or members. The union, however, will use its best efforts to prevent same.
“ '3. The Company may, subject to the grievance procedure herein provided, discipline or discharge any employee with respect to such work stoppage if he is at fault, and this shall constitute the Company’s sole and exclusive remedy for such action.
“ '4. This clause is the essence of the contract and one of the main considerations motivating [sic] the Union in entering into this agreement, and, in the event the Company or any of its representatives files any action in law or in equity for any of the things therein stimulated or induces or encourages any other person, association or corporation to do the same, this agreement may be terminated by the Union upon notice in writing to the company, irrespective of any term or condition, written or implied in this agreement.
“ '5. The Company further agrees to execute through its proper officers any release of claim or right of action *160 or actions promptly upon request of the Union for tlie things provided for in this section.’
“Before proceeding further, it should be pointed out that this appeal involves a bitter dispute with the labor unions in which neither the Government nor appellant has defended the position of the unions, and this Board does not have the benefit of having heard the union’s side of the controversy. No representative of a union testified at the hearings before the Engineers Board or this Board, and it is doubtful that any of the witnesses could be considered friendly to the unions. While the Board is required to decide the facts involved in the dispute between the Government and appellant on the basis of the evidence in the record, the Board’s decision, of course, is not binding on the unions who were not parties to or represented in this appeal. The Board has no reason to believe that representatives of the unions could have supplied any testimony that would have been helpful to the Board in reaching a correct decision on this issue in this appeal. However, the Board feels constrained to exercise caution in making findings derogatory to the union or expressing any opinion that the unions violated the law, when the nature of the proceeding is such that the unions have not had an opportunity to defend themselves.
“Plans for the activation of Plattsburgh Air Force Base were firmed up in the summer of 1955, when it was determined that troops would start arriving in September, and beneficial occupancy dates (BODs) were established for the dormitories and mess halls then under construction. It was necessary that the heating plant be operable by that time to provide heat for the new dormitories and mess halls, and appellant was called on to work ‘around the clock’ to get the boilers operable by the established occupancy dates. Although the original completion date for the first two boilers was 9 September 1955, there had been delay in completion due to various changes in specifications, as a result of which the completion date of the Central Heating Plant, including boilers 1 and 2, had been extended by Modifications Nos. 4, 5 and 6 for 97 days or until 15 December 1955 for the original heating plant and 15 March 1956 for boilers 3 and 4. Further *161 more, proceed orders ('NYB orders’) had been issued involving additional changes and delays in completion but had not yet formalized as change orders. In particular, there had been a change in the instrumentation for the automatic controls, which resulted in delay in delivery of the revised instruments. It was decided to start operating the first two boilers manually before completion, using operating personnel to be furnished by the Subcontractor who was constructing the heating plant. Although an operating agreement might have been entered into with another contractor, it was considered preferable that the operation of the boilers be under the control of the same contractor that was handling the construction.
“The contracting officer’s representative dealt directly with Raff in negotiating an operating agreement. Raff’s idea was to submit a lump sum price for the operating agreement, but the contracting officer’s representative asked for a proposal based on a unit price per week, as the duration of the operating agreement was unknown. The contracting officer’s representative testified that he asked the subcontractor to submit a proposal on a weekly price basis and asked that the price breakdown be based on operating for 300 days, as in his opinion this would tend to result in a lower price per week than a shorter operating period. However, he did not make any representation whatsoever as to how long the operating agreement would run. Raff’s vice-president who handled the negotiations for Raff testified that he got the impression from what was said by Government representatives that the operating agreement would run for about a year and that an operating agreement for a shorter period was being prepared because of the nonavailability at that time of sufficient funds to cover the operations for the full period contemplated. We find that the Government representatives did not make any representation as to how long the operating agreement would remain in effect, other than what may have been inferred by the Raff representative from the Government’s request for a price breakdown based on a 300-day operation. Indeed, it seems unlikely that the contracting officer and the Government representatives who participated in the negotia *162 tion of the operating agreement knew any more about how long the operating agreement would run than did appellant or Raff.
“On 11 August 1955 Raff submitted a proposal to operate the Central Heating Plant at a price of $5,800 per week “until such time as the United States Air Force definitely takes over the operation,” stating further:
“ ‘We also agree in this proposal to train any and all personnel which the United States Air Force may require to be trained for future operation of the Central Heating Plant after they have assumed the responsibility of operation.’
“On 8 September 1955 the contracting officer issued the contractor a proceed order, designated NYB-58, which referred to the Raff proposal of 11 August 1955, inclosing copies of the specifications for the operation of the heating plant, and stated:
“ ‘In accordance with Article 3, “Changes” of the contract, you are hereby directed to proceed with the operation and maintenance of the Central High Temperature Hot Water Heating Plant and Distribution System on a weekly basis commencing with the satisfactory start-up date of plant operations, and in accordance with above Specifications for Supplemental Agreement.
*****
“ ‘* * * Plant operation and maintenance under this directive shall continue for an indefinite period and until such time as terminated by the Contracting Of-officer.’
“The operating agreement was formalized as Contract Modification No. 23 dated 8 September 1955, but executed in February 1956, providing for the operation of the heating plant for an estimated period of 10 weeks at a price of $6,380 per week, which was shown for purpose of allotment of appropriated funds as an increase in the contract price of $63,800. Air Force construction funds could not be used for the operation of the heating plant, and the $63,800 allotted by Modification No. 23 for the operation of the heating plant were Air Force ‘Maintenance and Operations’ (M&O) funds and represented the entire amount of funds allocated by the Air Force to the Corps of Engineers for the *163 operation of the heating plant. The price of $6,380 per week represented the Raff price of $5,800 per week pins a 10% markup for the prime contractor.
“Pertinent provisions of the specifications forming a part of Modification No. 23 are as follows:
“ ‘These Specifications are for the operation and maintenance of Central High Temperature Hot Water Heating Plant and Distribution System, including the Utility Rooms in order to provide necessary heating facilities to the various buildings in accordance with the provisions of Contract No. D A-30-075-Eng-6009 with T. C. Bateson Construction Co.
“ ‘1. GENERAL: It is the intent of this specification to secure the provision of all materials and labor necessary for the work outlined below:
“ ‘(a) The operation and maintenance of the Central High Temperature Hot Water Heating Plant and Distribution System, on a weekly basis, twenty four hours a day operation 7 days a week, shall commence with a satisfactory start-up date of plant operations and shall continue for a period of approximately ten weeks or until such time as terminated by the Contracting Officer.
* $ $ $ $
“‘3. TYPE OF PLANT:
“ ‘ (a) The Central Heating Plant consists of four (4) hot water, high pressure oil-fired boilers with all necessary auxiliaries and controls. At least one (1) boiler shall have been completed and ready for operation. Three (3) other boilers are in the process of construction with the installation of necessary auxiliaries.
$ $ $ $ $
“‘15. OPERATION AND MAINTENANCE:
Hi * ❖ H* H*
“‘(a) Operation of Plant:
“‘(2) The boiler, or boilers, completed at the time this contract commences will be put in operation to supply the buildings with high temperature, high pressure hot water for the normal building requirements. The other boilers presently under construction, after testing and “boil out” procedures have been completed, will also be placed in operation in order to furnish heat for the requirements of the building serviced by the distribution system.
*164 “ ‘b. OPERATION AND MAINTENANCE:
“ ‘ (1) The Contractor shall, under this contract, operate and maintain the distribution systems now installed and any extension thereof which may be completed during the period of this contract. Specifically, the contractor’s responsibility shall originate at the Plant end of the Distribution Systems and terminate at the low pressure inlet and outlet connections on the steam and hot water converters in the various buildings connected to, or to be connected to, the High Temperature Distribution Systems. In those buildings which are heated directly by high temperature hot water the Contractor’s responsibility shall terminate at a point immediately inside the building but shall include the stop valves and automatic by-pass valves. The responsibility for the operation and maintenance of the low pressure piping, pumps, valves, regulating devices, radiators, utilization equipment, and all other appurtenances beyond the steam and hot water converters, and the piping and equipment beyond the automatic by-pass valves in those buildings without converters will rest with the Government after such facilities have been duely [sic] tested and operated as required under the terms of the construction contract now in force.
“ ‘21. TRAINING OF GOVERNMENT PERSONNEL : The Contractor shall train personnel of the Government for the express purpose of substituting such personnel in the various job categories required to fully operate and maintain the Plant and High Pressure Distribution Systems.’
“At the time Raff started performance under the operating agreement only one of the boilers was in operable condition. None of the automatic controls had been installed, and electric service was by a temporary hook-up. Raff operated the heating plant with personnel who were members of the electrician’s operating engineers’ and plumbers’ and steamfitters’ unions. At that time there was no established contract completion date on either boilers 1 and 2 or boilers 3 and 4.
“About 1200 Air Force troops arrived during September and started occupying the new facilities. After spending about a week in drying out refractories, Raff started operating the first boiler in providing heat for the newly occupied buildings on 26 September. When the second boiler was completed to the stage where it was operable, Raff started op *165 erating it also in providing heat for the new buildings occupied by Air Force personnel. Raff operated boilers 1 and 2 in providing heat for six dormitories and two mess halls that had been constructed by another contractor and had been taken over for beneficial occupancy by the Air Force. In no instance were the boilers operated to provide heat for any buildings under construction by appellant or any other contractor. The workmen employed by Raff to operate the heating plant were obtained from the same hiring hall and members of the same unions as workmen employed by Raff in the construction of the heating plant.
“The Air Force recruited civil service personnel for the operation of the heating plant which were to be trained by appellant pursuant to the operating agreement. The training program started on 16 October. The Air Force complained that the training of civil service personnel was not proceeding satisfactorily, as a result of which it was improved, and by 15 December the civil service personnel were adequately trained and qualified to take over the operation of the heating plant.
“The operating agreement could not be continued in effect for longer than ten weeks without an allocation of additional M&O funds from the Air Force, and it was readily apparent that the heating plant, inclusive of boilers 3 and 4, would not be completed by that time. Rumors began to spread, and the unions became uneasy as to what would happen when funds for the operation of the heating plant were used up. On 24 October the Air Force Installations Engineer at Plattsburgh advised the Resident Engineer that the operating agreement would not be extended. As a result of the agitation over what might happen if the Air Force took over the operation of the first two boilers with civil service personnel before completion of the entire heating plant, labor relations advisers from the New York District and the North Atlantic Division visited Plattsburgh on 3 and 4 November and had talks with the union representatives.
“Following this visit, there was a conference at the New York District on 7 November which was attended by Air Force officials from Plattsburgh and SAC Headquarters, as *166 well as the labor relations advisers and other Corps of Engineers officials. The New York District labor relations advisers gave the opinion that the unions would not “stand for” the Air Force taking over the operation of the first two boilers with civil service operators before boilers 3 and 4 in the same building were completed. Later on the same day Army Engineers and Air Force representatives had a meeting with the vice-president of Raff. In response to inquiries he expressed the opinion that boilers 1 and 2 could be completed and civil service operating personnel trained by the end of 15 December.
“As an outgrowth of the 1 November conference the New York District Engineer wrote a letter dated 15 November 1955 addressed through channels to the Officer in Charge, USAF Installations Representative Office, North Atlantic Division, New York, New York, stating:
“ '1. At a meeting held in this office on 7 November 1955 with representatives from Plattsburgh AFB, Hq. SAC, and North Atlantic Division, Corps of Engineers, the following data was given the Air Force to provide information on which to base its decisions concerning the operation of the Central Heating Plant:
“ ‘a. The first two boilers in the Central Heating Plant will be completed by 15 December 1955. The second two boilers are scheduled for completion on 30 March 1956.
“ ‘b. The cost of operating the Central Heating Plant under the present arrangement is $6,380.00 per week plus the minimum amount that must be added for Government costs which is $185.00 making a total of $6,565.00 per week. The money presently available for this work, $69,600.00, will cover the cost of operating the aforementioned plant until 9 December 1955. An additional $6,565.00 will be required to continue the operation until 15 December 1955. If it is decided that the present contractor shall maintain the Central Heating Plant and the HTHW distribution system until the completion of all four boilers scheduled for 30 March 1955, [sic] then additional funds in the amount of $105,040.00 will be needed, which amount includes no contingencies.
“ 'c. The Labor Specialists of this office and the North Atlantic Division have contacted the International Representatives of the Unions involved in the operation of the Central Heating Plant and have been informed by them, that they will insist upon operating the Central *167 Heating Plant with, construction mechanics until all four boilers have been completed. Operation of the plant by Civil Service personnel upon completion of the first two boilers will lead to strike involving the entire Base.
“ ‘2. In review of the above facts there are only two prudent courses which this office can suggest to the Air Force:
“ ‘a. The first is to attempt to convince the Unions involved to reverse the stand that they presently take concerning the employment of Civil Service personnel in the Central Heating Plant after acceptance of the first two boilers. Since every possible effort has been made at this level to persuade the Unions to accept the operation of the first two boilers by the Air Force, it ^recommended that any further contact with the Unions be made at the very highest possible level.
“ 'b. The other suggested course of action is the obvious one which would require the authorization of the expenditure of additional funds in the amount of $105,-040.00 plus contingencies, to operate the Plant until the four boilers are completed.’
“The District Engineer did not receive any reply to his 15 November letter except telephone advice that the Air Force would not make funds available for the operation of the heating plant by the contractor beyond 15 December.
“Aside from the above-quoted letter of 15 November the contracting officer did not at any time ask for funds to continue the operating agreement beyond 15 December. Obviously the contracting officer could not extend the operating agreement beyond that date without funds that could be used for such purpose, and obviously the heating plant had to continue in operation after 15 December to provide heat for the newly occupied' buildings. Without making any specific request for funds for contractor operation after 15 December, the 15 November letter stated in effect that additional funds would be required for contractor operation after 15 December and that operation of the heating plant by civil service personnel would lead to a “strike” involving the entire Base unless the unions were persuaded to change their position, and that, since every possible effort had been made at the contracting officer level to persuade the unions to accept operation by Air Force civil service personnel, any further *168 contact with the unions should be made ‘at the very highest level.’
“The AFIR testified that the District Engineer asked for additional money to operate the heating plant and that this ‘information’ was passed on through SAC to Hq., USAF. The District Engineer testified that he did not ask for any more money than what was required to operate to 15 December. Apparently the AFIR had reference to the 15 November letter when he said that the District asked for additional funds, as the record does not show anything else in the nature of a request for funds.
“The decision for the Air Force to take over boilers 1 and 2 for operation with civil service personnel was made by the Air Force at a higher level than the Base Commander of the AFIR. Major General Lee B. Washboume, Assistant Chief of Staff, Installations, USAF, played a major part in this decision. Appellant requested that the Government have General Washbourne present to testify at the hearing of the appeal, but General Washbourne has retired from the military service and could not be made available as a witness. However, the Government offered in evidence three memo-randa prepared and signed by General Washbourne, and these memoranda were admitted in evidence without objection by appellant. Due to the rotation of military personnel, the only individual in Hq., USAF who participated in the decision that could be made available as a witness was Chester J. Cooper, who testified as to his participation and on the basis of information received by him in Washington through official communications.
“On 2 December the Office of the Assistant Chief of Staff, Installations, USAF, received a report on the operation of the heating plant which indicated that certain Air Force officials ‘had changed their minds about the effects of a strike at Plattsburgh, and now desired to give in to the threat of the strike.’ General Washboume was strongly opposed to any such change in the plans to take over the operation of the heating plant on 15 December, but reported the matter to the Vice Chief of Staff, USAF. On the same day he dispatched a teletype message (TWX) to SAC Hqrs., which apparently ‘recommended’ that the operation of the heating plant with *169 civil service personnel proceed according to plan. This TWX was coodinated with various interested offices of Hqrs., TJSAF, and was ‘cleared’ by the Vice Chief of Staff at 4:06 p.m. on 2 December. A Memorandum for Record concerning the TWX stated that on 28 November an officer in the Directorate of Procurement and Production and a labor relations adviser expressed the opinion to Mr. Chester J. Cooper that ‘in view of the facts that (1) the two boilers will become Air Force property on or about 16th of December, 1955, and (2) at which time the contractor and his employees have no further connection with these boilers, their work being completed, policy requirements to employ private contractor’s employees for this work no longer exists.
“Some of the considerations which influenced the decision of the Assistant Chief of Staff, Installations, and his staff are indicated by the following excerpts from the testimony of Chester J. Cooper, a consultant on heating and fuels in the Office of the Assistant Chief of Staff, Installations:
“ ‘A. My understanding was that the plant was in temporary operational condition, was being operated by the contractor, simultaneously training our Civil Service personnel to prepare them to take over on the 15th of December, as we normally do. We operated our own bases with Civil Service, and it was so planned at that time.
$ ‡ ‡ $
“ ‘A. Well, we felt that the cost of operating that plant, I do not remember the figures now, but I believe it was somewhere probably around $6,000, roughly. Normally these plants — by contract operations, the majority of them will run somewhere between, I would say, $80,000 a year and $100,000 a year, and that would mean that dividing that by 52, it would probably mean roughly $2,000 a week, and this ran much higher. We thought it was quite high at the time.
íJí sfc # ❖
“ ‘Q. Mr. Cooper, I notice here in Government’s Exhibit B, that the words “of the newly completed Base Heating Plant” in the third line of paragraph 1 — now, you all weren’t under the impression in Headquarters, were you, that these two boilers were completed and had their electrical connections and everything installed?
*170 “ ‘A. No. I think we realized it was not totally completed, however I will say this, that when a plant is ready to be turned over to us for operation, although a plant may not be completed, we accept it under what we call our Form 290, and if the plant is not completed at that time we note the deficiencies on the Form 290 and we usually always take them over with the deficiencies, and we operate the plant with those deficiencies, and the .contractor continues his work or comes in later and corrects the deficiencies or completes them at a later date. This was an operable plant, we would say — not totally completed, per se.
“ 'Q. Let’s examine that a minute. It was operable, but didn’t it require a good deal greater number of operators to operate it than it would, had it been complete with its electrical controls ?
“ 'A. There is a diversity of opinions on that. Now my opinion is that although a plant is not totally instru-mentized or not fully automatic, that we can operate it manually without greater personnel. * * *’
“Government representatives considered the cost of operation on the heating plant by the contractor as grossly excessive. In addition to the salaries of the civil service trainees, it was costing the Government $6,380 per week, compared to what was felt to be the normal cost of operation of such a plant of only about $2,000 per week.
“On 7 December General Washbourne personally visited Plattsburgh and inspected the progress of construction and acquainted himself with the operation of the heating plant. He noted that there had been slippage in BODs for facilities required for the activation of flying elements, due to a serious labor shortage and labor difficulties.
“On 8 December General Washbourne held a conference at Plattsburgh at which time the operation of the heating plant was discussed. This conference was attended by the Base Commander, the Wing Commander, the AFIR, the Resident Engineer and representatives of SAC and Eighth Air Force. A chart on the wall in the Base Commander’s office showed the completion date of the heating plant as 15 December, and it was indicated at the conference that such completion date would be met. General Washbourne’s ‘trip *171 report’ contains tbe following statement concerning the heating plant:
“ ‘A special effort has been made to place the central heating plant in operation with the initial two boilers by 15 December. This plant has been producing heat with lash-up controls since early September, and no discomfort is being experienced due to continuing work on the second set of boilers; however, a weekly operation charge of $6,300 to the contractor for operating the uncompleted plant is causing a severe drain on the M&O funds available to SAC. The resident engineer stated that the effort required for the contractor to turn this plant over to the station commander by 15 December would unavoidably drain skilled labor from the five other critical buildings whose BODs are critical to wing activation. Having received assurances from the contractor that this 15 December date would be met on the heating plant, I hesitated to change his request in order to protect the dates on the other buildings. Although the station commander has Civil Service employees ready to operate the plant beginning 15 December, he has been advised by the contractor that the local labor union will strike that and other essential construction unless the operation of the plant is continued by contract until completion of the supplemental contract for additional boilers. The local labor unions have repeatedly demonstrated their ability to shut down construction work at Plattsburgh whenever they decide to do so. The building is structurally complete, and when the initial boiler contract is completed on 15 December, it would be logical for the Air Force to accept the building and operate the plant, while at the same time permitting the contractor to work in a roped-off portion of the completed building on the second set of boilers. This would terminate an apparently unreasonable contract operating cost, but would quite likely trigger off a work stoppage on other essential buildings.’
“On 8 December the contracting officer sent the contractor a telegram stating:
“‘Confirming telephone conversation of 7 December 1955, you are notified that an inspection of the Central Heating Plant at Plattsburgh AFB leads this office to believe that the working force in this building is insufficient to complete the unfinished work on Boilers Numbers one and two by the contract completion date of 15 *172 December 1955. You are therefore directed to immediately review this situation and to increase as necessary your working force and the working forces of your subcontractors, and to supervise these forces so as to assure completion of Boilers Numbers 1 and 2 including painting and clean up of the Boiler House containing Boilers Numbers 1 and 2.’
“The Base Commander had the Resident Engineer arrange a meeting which was conducted by the Base Commander in his office on 15 December starting at 9:00 a.m. The meeting was attended by representatives of the local unions, the contractor and the subcontractor, as well as representatives of the Air Force and the Army Engineers. The purpose of the meeting was to make one last effort to avoid a strike. The Base Commander led off the meeting with a 45-minute talk explaining the importance of the completion of the Base and making a patriotic appeal to the union representatives not to deter national defense. He then attempted to impress on the unions that the Air Force had every right to take over the operation of the first two boilers upon their completion, emphasizing that the contract called for the completion of the first two boilers by 15 December, that it was an Air Force facility, that people had been trained to take over the operation of the first two boilers, and that the Air Force was going to take over as it had a right to do. Concerning his appeal to the union representatives, the Base Commander testified:
“ ‘A. * * * I did most of my addressing to the kingpin of the labor union agents, a Mr. Floyd Donah, and his grievance was that his personnel, the plumbing and steamfitters union, could not possibly operate under the same roof with non-unionized Government civilian employees. I told him that these civilian employees would not be indulging in any construction whatsoever, that their only job was to operate the central heating plant. This did not sway him one iota.’
“The Base Commander stated that he did not have funds to continue the operation of the boilers by contract and that it was not possible to obtain the funds in the time available. Raff’s vice president attempted to meet this argument by offering to operate the boilers for a few days without charge until funds could be obtained.
*173 “The representatives of the electricians’, operating engineers’, and plumbers’ and steamfitters’ unions took the firm position that their men would not work with non-union men. The position of other union representatives was that their men would not cross picket lines.
“The Base Commander announced that he had instructions from higher authority to take over the operation of the boilers at midnight. When it became clear to the Base, Commander that the unions would not back down and that there was going to be a strike, he asked that there be no violence and that Government property be protected.
“The meeting broke up at 11:20 a.m., and shortly thereafter SAC Hq. and Assistant Chief of Staff, Installations, were informed that the meeting had been unsuccessful and that the labor leaders had advised the Base that a complete walk-out would be placed in effect early Friday, 16 December. Prior to 15 December the Air Force and the Army Engineers had made plans as to the action to be taken in the event of a strike, which included the protection of property on the Base by means of military police. On the afternoon of 15 December officers were alerted with a view to moving the SAC wing temporarily from Plattsburgh to Pinecastle Air Force Base, Florida, when the strike started.
“Appellant’s General Superintendent was present at the 15 December meeting and expressed his opposition to the stand taken by the unions. After the meeting he told the Besident Engineer that the contractor could not be responsible for any resultant strike damage, and later in the day he phoned the contracting officer and asked that the heating plant contract be terminated. On the same day appellant’s superintendent sent the contracting officer a telegram and a letter stating that appellant would not be responsible for any damages caused by the operation of the heating plant by Government civil service employees and would not be responsible for any damages due to the anticipated “walkout of all our construction workers.”
“On 15 December the contracting officer dispatched a telegram to appellant stating:
“‘REFERENCE CHANGE NUMBER NY B58 CONTRACT 6009 YOUR RESPONSIBILITY TO *174 OPERATE BOILER PLANT WILL CEASE AS OF TIME THIS OPERATION IS ASSUMED BY PLATTSBURGH AIR FORCE BASE REPRESENTATIVES AS DETERMINED BY COLONEL DUERSON MY REPRESENTATIVE AT PLATTS-BURGH AIR FORCE BASE.’
“Immediately prior to and on 15 December 1955' appellant, through its subcontractor, was still working on the Central Heating Plant. Counsel for appellant and the Government have stipulated that boilers 1 and 2 were ‘substantially completed’ at that time.
“The Air Force took over the Central Heating Plant from the Corps of Engineers between 11:00 and 12:00 p.m. on 15 December. There was a joint inspection of the facility, and the official transfer of the facility was accomplished by the execution of an Engineer Form 290 which described the transferred facility as ‘Construction of Central Heating Plant including Boilers 1 and 2’ and ‘Building No. 2658.’ The Base Commander and the Installations Engineer signed the Form accepting the construction as in accordance with specifications, etc. ‘except for deficiencies listed on the back of the sheet.’ On the back of the Form were listed 54 deficiencies. The following are some of the more important listed deficiencies pertaining to completeness: Various tests not made; flow motors, fuel oil storage system, zone piping to pumps, power and control wiring, pump control wiring, pipe and boiler insulation, Hays boiler controls, waterproofing of roof and interior painting incomplete; fuel oil transfer pumps not installed, angle thermometers not installed, cold water storage not installed, installations of boiler systems Nos. 8 and 4 incomplete.
“At the time of the take over by the Air Force boilers 1 and 2 were still being operated manually, using a temporary electric service hook-up, as the permanent electric service had not yet been constructed and the automatic controls for the heating plant had not been received and installed. As of that time ‘NYB orders’ involving changes had been issued to the contractor which were subsequently formalized by contract modifications granting time extensions on the completion of the heating plant to a date subsequent to 15 December 1955; *175 hence, the contract completion date for boilers 1 and 2 had not arrived on 15 December 1955.
“The civil service employees who had been trained by the contractor toot over the operation of the heating plant at 12:01 a.m. on 16 December, at which time the contractor-employed operating personnel were paid off and departed without incident.
“By 7:00 a.m. 16 December picket lines had formed outside all entrances to the Base. All the picketing was done by the three unions involved in the construction and operation of the heating plant. The pickets carried signs bearing the legend:
“ ‘Plumbers and steamfitters working here are not members of Local 497.
“ ‘Electricians working here are not members of Local 781.
“ ‘Operating engineers working here are not members of Local 106.
“ ‘All persons are free to cross picket line.’
“In some instances the last line of the above-quoted legend was omitted from the picket sign.
“The picketing was 100% effective in bringing all construction work at the Base to a complete halt on the morning of 16 December. No construction workers employed by any contractor at the Base crossed the picket line and entered the Base to report for work, although workers with “company passes” were free to enter and report for work despite the presence of military guards that had been posted at all entrances. While many men crossed the picket line and entered the Base to pick up their pay checks or to get their tools and personal belongings which they had left at the work site the day before, none of them crossed the picket line in violation of union regulations. The general attitude of the workers in discussing the matter with Army and Air Force personnel and with officials of the contractor was that they were union men and would not cross a picket line. As union men they were aware that a union member who crosses a picket line in violation of union rules is subject to fine or expulsion from the union or both.
*176 “Wlien it became apparent that the workmen would not cross the picket line to go to work, the security guard was tightened, and no personnel of the contractor was permitted to enter the Base without a clearance. After three or four days a system was established whereby names of contractor personnel desiring to enter the Base were submitted to the Resident Engineer for approval and the approved list was passed on to the Provost Marshall [sic]. The military police were under the command of the Base Commander, and he established security guards at all entrances and military police patrols throughout the Base, and a circle of guards was placed around the heating plant. The Base construction was spread out over a large area which was unfenced and was traversed by several public roads; hence, the only practical way to protect Government and contractor property from pilferage and possible sabotage was by roving patrols. There was little, if any, pilferage or damage to property by human beings during the work stoppage.
“The civil service employees operated the heating plant satisfactorily during the work stoppage in providing heat to the buildings occupied by the Air Force. However, the Central Heating Plant was not used in providing heat to any buildings under construction by the contractor, as the contractor had used other means in providing necessary heat during construction. During the work stoppage the temperature ranged from 32°F to minus 20°F. After the commencement of the work stoppage the Air Force had to take over the operation and protection of the sewage plant lift station to provide essential sewage service for the occupied buildings. The Air Force also started using or occupying some other buildings under construction by appellant, including part of the Base Maintenance Hangar, in some instances by agreement with the contractor, and other instances without any coordination with the contractor. During the first few days of the work stoppage supervisory personnel of the contractor entered the Base to check utility rooms, but this activity was discontinued without notice to the Goverment, and the Air Force took over this responsibility. Union rules permitted union men to cross picket lines under ‘emergency conditions’, *177 and appellant was permitted to bring union plumbers and electricians into the Base during the work stoppage under what were recognized as ‘emergency conditions’ by the unions. Naff tried to get union men to enter to protect property from freezing, but the unions refused, taking the position that this did not constitute an emergency. Most of the property damage which occurred during the work stoppage was a result of the freezing weather, but some damage was caused by the Air Force use and occupancy of the buildings and facilities under construction.
“Both before and after the commencement of the strike, the union representatives refused to discuss settlement of the issue with representatives of appellant or its subcontractor, taking the position that their dispute was with the Air Force and that they had no dispute with the contractor or subcontractor. In view of the position of the union locals the contractor and subcontractor did not attempt to take the matter up with the international union representatives. Neither did the contractor contact the National Labor Relations Board or take any action to have any action brought against the unions pursuant to the so-called ‘secondary boycott provisions’ of the Labor-Management Relations of 1947 [sic] (29 USC Sec. 141 et seq.) known as the Taft-Hartley Act.
“The contracting officer was disappointed at the failure of the contractor to initiate aggressive action to end the walkout, as he considered this a responsibility of the contractor rather than the contracting officer. In view of the contractor’s failure to take action, the contracting officer called a conference which was held in his office on 22 December and was attended at his invitation by representatives of the contractor, the subcontractor, the Air Force, Army labor relations advisers and both local and international representatives of the three unions involved in the construction of the heating plant. Although appellant’s Superintendent was there, the contracting officer was greatly disappointed that Mr. T. C. Bateson of Dallas, Texas, did not attend personally, because Mr. Bateson is a nationally known figure of great prestige in the construction industry and with the building trades unions, and the contracting officer felt that *178 his presence would have had an influence in bringing about a settlement.
“At this meeting the contracting officer used the approach that it was up to the contractor and the union representatives to get together, but the International Representative of the plumbers’ and steamfitters’ union countered with the contention that the unions were not in conflict with the contractor, but with the Government. The contracting officer refused to recognize this position.
“The position of the unions was not precisely defined at this meeting or at any other time. The contracting officer, a man with extensive experience in construction, testified that it is the nature of unions that they do not state their position definitively. However, it is clear that they claimed that their collective bargaining agreements gave them jurisdiction over all labor to operate the heating plant until the completion of construction of the heating plant, including boilers 8 and 4. The International Representative of the plumbers’ and steamfitters’ union stated that the walkout was to protect their agreement with Raff. The contracting officer insisted that the pickets should withdraw and let the construction workers go back to work with the Air Force civil service personnel operating the heating plant. The union representatives stated that it was impossible for them to do this, as all over the country union men were operating plants on a temporary basis while construction was going on, and they would not make an exception in this case.
“The 22 December meeting did not last long and apparently broke up abruptly when the contracting officer stated, in reply to a union inquiry, that he did not have authority to settle the strike.
“Throughout the 38-day strike the union representatives stated repeatedly, both orally and in writing — to the contractor, the subcontractor and the contracting officer — that their conflict was with the Air Force and that they had no complaint against the contractor or subcontractor. An example of this position of the union is shown by the following testimony of the subcontractor’s vice president:
“ ‘Well, once or twice when the walk-out first happened, we had a condition of everything, being left in a *179 very bad state; in other words, as far as the things freezing and damage, and I remember when the strike first appeared we did ask the steamfitters to allow some men to come in and take care of a big hangar. We felt the pipes were going to freeze. He absolutely refused and at that time, as I remember, I think we went to Colonel Duerson and even asked the Colonel if he would call up the plumbers and ask them to send some men in on a temporary basis to help us to relieve this condition at the big hangar. * * *
❖ ij: # % ❖
“ ‘Well, they just said that their fight was with the Air Force and not with us, they were very sorry they would like to take care of anything they could, but they just had made a stand and they wouldn’t come to work unless it was a real emergency, some life in danger.
“ ‘In other words, they had no complaint against you in your capacity as a subcontractor?
“ ‘No, none whatsoever.’
“The strike was settled at meetings held on 20-21 January 1956. The first such meeting was called by the contracting officer after he received word that the Air Force would make funds available for the reinstatement of the operating agreement with the contractor. This meeting was attended by representatives of the Army Engineers, the Air Force, the unions, the subcontractor, and appellant, including Mr. Bate-son. At this meeting it was announced that the civil service employees would be withdrawn from operating the heating plant, and the contracting officer’s principal concern was over the cost of the operation of the heating plant by the contractor which he considered grossly excessive. In operating the plant under Modification No. 23 Kaff had used 22 men. In operating it with civil service labor, the Air Force was operating it satisfactorily with 17 men. In each case the operation involved four shifts of labor to operate the plant around the clock seven days per week. The contracting officer felt that the number of men insisted on by the unions to operate the plant involved “featherbedding.” The contracting officer askd the contractor and the unions to get together and negotiate an agreement for the operation of the heating plant that was reasonable as to cost (i.e., number of men to operate) and as to duration.
*180 “In tbe agreement reached the unions made some compromise as to number of operating personnel which resulted hi a reduction of the price paid by the Government from $6,380 per week to $6,104.68 per week. Agreement was also reached for a definite period of time for the operation of the heating plant by the contractor with union labor. The unions agreed that the new operating agreement remain in effect for 16 weeks, after which they would not object to the operation by civil service personnel. On 21 January 1956 the Government and the contractor concluded the negotiation of a new operating agreement to be effective on 23 January (Monday) which was formalized as Modification No. 34. It was in essentially the same terms as Modification No. 23, except that the weekly price was $6,104.68 and it was for a period of 16 weeks.
“On 23 January 1956 the Army Engineers and the Air Force executed an Engineer Form 290 transferring the heating plant back to the Army Engineers, and the civil service personnel were withdrawn from the operation of the heating plant and reverted to a trainee status, whereupon the contractor resumed the operation of the heating plant pursuant to Modification No. 34. At the expiration of Modification No. 34 the civil service personnel of the Air Force took over the operation of the heating plant without any objection from the unions, although at that time some work remained to be done on boilers 3 and 4 and on the distribution lines. However, the heating plant was not transferred back to the Air Force by the execution of a Form 290 until 17 September 1956.
“The picket line was removed after the withdrawal of civil service personnel from the operation of the heating plant on 23 January, at which time appellant resumed performance of its construction contracts. However, appellant was not able to resume full operations immediately, because most of the skilled labor employed by the contractor and its subcontractors prior to 15 December had departed to other parts of the country, and it was necessary to recruit a new labor force.
“Some of the employees rendered idle by the 38-day work stoppage including members of the three union locals involved in the construction and operation of the heating plant, *181 filed claims for unemployment insurance compensation. After a combined bearing and Referee’s Report, the New York Unemployment Insurance Appeal Board held that the claimants were not barred from unemployment compensation benefits on the ground that they lost their employment ‘because of a strike, lockout, or other industrial controversy.’ The issue was whether the claimants were barred from benefits on either one of the following grounds: (1) that they left their employment without good cause; or (2) that their loss of employment was due to an ‘industrial controversy’ in the establishment where they were employed. The following is quoted from the decision of the Appeal Board:
“ ‘The purpose of the picketing was to bring pressure to compel the Air Force to contract with the general contractor to have the heat maintenance work performed by a sub-contractor employing members of the appropriate unions. The union members could only work for a contractor in contractual relations with their union, not for the Air Force directly. No demands were made by any of the unions on any of the employers operating at the base. No dispute existed between any of the employers and their employees. No dispute existed between the union members and the Air Force as to terms and conditions of employment. * * *
“ ‘* * * No elements of a strike or lockout existed as far as concerned the workmen and their employers. Further, we are unable to find in this case that there were present any of the elements of an industrial controversy, as contemplated in Section 592.1 of the New York State Unemployment Insurance Law. No dispute existed between the various contractors and their employees either with respect to representation or terms and conditions of employment. No controversy had arisen at any time out of the respective interests of these employers and their employees. Neither the mere placing of pickets at the premises where the work was being performed or the concerted work stoppage which resulted for the purpose of exerting pressure on a third party in order to compel that third party to have certain services performed by contract with a particular type of contractor rather than to have the work otherwise performed, does not create an industrial controversy within the meaning of the Law. Whether or not this can be labeled as a secondary boycott or an economic weapon of some other sort is not material to this case.’
*182 “The decision of the Appeal Board that there was no ‘industrial controversy’ within the meaning of the New York statute was reversed by the New York Supreme Court, Appellate Division in a decision wherein the court said:
“ ‘The foregoing statement of course is not one of fact but one of law, and we disagree with the conclusion reached by the Board. While it may be said, at least technically, that no lockout or strike existed, certainly an industrial controversy existed. The language of the statute in that respect is very broad and there is no indication in its legislative history or otherwise that the legislature intended to limit such language as narrowly as the Board in this case has construed it.’
“For a proper understanding of the causes of the strike, i.e., how the situation developed which resulted in a 38-day work stoppage, we need to know something of the background of labor difficulties which preceded the strike. There was insufficient skilled construction labor in the area for the needs of such a large construction project, and labor was drawn to the project from other parts of the country and from Canada. Throughout the performance of the contracts there was a shortage of labor, which appears to have put the unions in a strong bargaining position. The contracting officer testified:
“ * * I knew of the strength of the unions. I felt that the unions were trying to flex their muscles to an extent that I could definitely take warning from that of the consideration of this new area as a boom town, which in fact is what it became, that the unions following a pattern which I had seen before would naturally try to grow in strength.’
“Appellants’ Superintendent testified that, prior to the 15 December 1955 work stoppage, there had been many labor disputes involving work stoppages which generally were settled by acceding to the demands of the union. In one instance a subcontractor (not Naff) filed a charge with the National Labor Relations Board in connection with a jurisdictional dispute over the claim of the operating engineers’ union that only an operating engineer could start and stop a compressor. In this instance no work stoppage developed. The Memorandum prepared by General Washbourne following his visit to *183 Plattsburgh on 7-8 December shows that he was under the impression that new beneficial occupancy dates on facilities needed for flying operations would not be met, that the Plattsburgh contractors had been unable to achieve a satisfactory response from labor, as a result of which most of them were on the verge of bankruptcy, and that the contractors were not in position to further influence dependable completion dates at Plattsburgh. While these statements in General Washbourne’s Memorandum are not proper evidence of the facts stated, they are evidence of his own opinion and beliefs at the time. General Washboume fully expected the take over of the heating plant operation with civil service employees to result in a strike, and he hoped that the force of public opinion would quickly bring it to an end.
“Although in discussions with Government representatives the position taken by the unions was that their collective bargaining agreements gave them jurisdiction over the operation of the heating plant until the completion of construction of the heating plant and that such was the normal procedure all over the country, the Government offered evidence designed to prove the contrary. It is apparent that the unions did not object to working beside non-union civil service employees engaged in performing work over which the unions did not claim jurisdiction. At the Plattsburgh site in the rehabilitation of the Old Base union men employed by construction contractors worked beside non-union civil service employees engaged in performing their normal duties of servicing and maintaining the old facilities. The unions made a distinction between the operation of an existing facility while an addition to such facility was being constructed and the operation of a newly constructed facility before the completion of construction of such facility. They did not claim j urisdiction over operators as to the former, but did as to the latter. Subsequently, when boilers 5 and 6 were being added to the heating plant, the unions did not object to the continued operation of boilers 1, 2, 3, and 4 by civil service personnel. However, they refused to treat boilers 3 and 4 as an addition to an existing facility.
“The record is incomplete and inconclusive as to the scope of the unions’ jurisdiction over the operation of the heating *184 plant as granted by applicable collective bargaining agreements. Appellant bas not alleged or offered any evidence to prove that applicable collective bargaining agreements gave the unions jurisdiction over the operation of boilers 1 and 2 after 15 December. On the contrary, appellant strenuously opposed all efforts of the Government to introduce the applicable collective bargaining agreements into evidence. There is no indication that anyone took any action to obtain a ruling on the unions’ jurisdiction from the ‘Denlop Committee’ which decides jurisdictional labor disputes in the construction industry.
“The evidence shows that a major consideration influencing the Air Force decision to take over the operation of the heating plant with civil service employees at the end of 15 December was the understanding by staff elements of Hq., TTSAF, who participated in the decision, that it was the normal situation of the Air Force taking over the operation of a newly constructed facility upon the completion of construction. Government witnesses testified as to various instances throughout the country where Government civil service personnel had taken over the operation of heating plants at military installations prior to the completion of all construction work without any objection from the unions involved in the construction work. One instance involved a heating plant which civil service personnel started operating before final testing and installation of automatic controls, but it does not appear that any of the boilers were so incomplete as to be inoperable. The only instance related by any witness of civil service personnel operating one boiler in a heating plant before other boilers in the plant became operable was at an installation in Missouri, involving a heating plant with 8 boilers, where, after the completion of one boiler except for testing and automatic controls, it was operated by civil service personnel while the other boilers were being constructed. Although labor agreements defining the unions’ jurisdiction over work are in standard form throughout the country, a Government witness testified that interpretations of union jurisdiction varied from locality to locality and appeared to him to be ‘according to the whims of the business agents’.”
While no specific allegation of arbitrary or capricious ac- *185 tíon is pleaded, we think it is unnecessary in the light of this opinion, i.e., we are faced here with a question of law with relation to the contract terms.
The issue in this case is whether plaintiff is entitled to a price readjustment under Article GC-10 or Article GC-11 for the increased costs of performance caused by the work stoppage or whether the Government must respond in damages for a breach of the contract.
At the outset, we are of the opinion that there was no breach of the contract by the Government. What the Government did with respect to putting civil service employees on the job was within the terms of the contract. This is not to say, however, that the Government could take refuge in the contract provisions and perform acts which it knew would delay and hinder the contractor in the performance of the work. In other words, in our opinion, the Government had the right to do any act within the terms of the contract, but if said action caused plaintiff delay and damages it follows that under certain circumstances the Government is liable to the contractor therefor.
Beyond question, and as stated by the Board of Contract Appeals hi its decision:
If ever there was an instance where a strike was certain and occurred, responsible Government officials were aware that a strike was the highly probable consequence of the Government’s planned action. After the meeting which ended at 11:20 a.m. on 15 December, the responsible Government officials knew that the last chance of persuading union leaders not to call a strike had passed, and they fully expected a strike to result when the Government took over the operation of the heating plant with Civil Service labor. After making full allowance for the fact that unions frequently do not carry out strike threats, there was no reasonable basis for the Government representatives to have believed that a strike would not result from the planned take over of the heating plant operation, as the union leaders made their position crystal clear, and the Government representatives were fully aware from past experience that the union leaders had the power to bring about a work stoppage and would not hesitate to do so if their demands were not met. In fact, Government officials fully expected the strike which occurred. We find that the work stoppage was the foreseeable and probable result *186 of the Government’s action in taking over the operation of the heating plant with non-union Civil Service labor.
Beyond question the contractor was delayed 38 days and incurred additional expenses by reason of the delay.
Article GC-11 of the contract was designed to incorporate and go beyond the principle that it is an implied provision of any contract that neither party will do anything to prevent performance thereof by the other party or will hinder or delay him in Iris performance. George A. Fuller Co. v. United States, 108 Ct.Cl. 70, 94; Restatement of the Law of Contracts, sections 295, 315; Williston on Contracts, sections 677, 1318; Chalender v. United States, 127 Ct. Cl. 557, 563; The Kehm Corp. v. United States, 119 Ct. Cl. 454, 470.
Applying the above principle to the facts of this case, one cannot escape the proposition that the Government knew what the consequences of its action would be. The Government was familiar with the labor agreement in force in the Plattsburgh area; it knew of the strength of- the unions in the area; it knew that the only labor available was union labor or laborers connected by family ties to union labor.
It knew of the agreement between the subcontractor and the union relating to a union shop and it knew that its action in placing non-union men in charge of heating facilities before completion of the job would most certainly cause a strike. Knowing all this, the Government stood steadfast in its resolution to, at whatever cost, turn the operation of the heating facilities over to civil service employees. Cf. United States v. Beuttas, 324 U.S. 768, 773. When it did this, it could only be attributed to either an endeavor to save funds or to force a showdown with the union. In either event the end result was not to do something for the contractor but to gain some advantage for the Government. As to what advantage a showdown with the union would offer we can only hazard a guess, but definitely a monetary advantage was present when a savings in cost of maintenance occurred. As it finally turned out, no savings actually occurred when costs of transferring facilities and the subsequent agreement turning the operation back to the contractor is taken into consideration. However, the result is not important; it was the purpose which should determine *187 whether the action taken was for the “convenience of the Government.” In any event, the Air Force officials could be said to be “penny wise and pound foolish.” Knowing a strike would precipitate, to save costs of operation the Air Force was forced to move its operations at great cost. The point is, however, the Government must have thought it to be in its best interests when it took over maintenance, and the Government actually did know that all work would be actually suspended by reason of its acts. In this respect it cannot, by any stretch of the imagination, be said that the strike was caused by the contractor, that it had anything to do with it, or that the strike was actually against the contractor. In reality, the strike and resulting picket lines were aimed at the Government and its use of non-union labor.
In this posture of the case, our opinion is that the provisions of Article GO-11 are brought into operation. The Government’s action demonstrates that, knowing all the consequences, its determination to use civil service employees which caused the strike could only be for the convenience of the Government. Under these circumstances, when it did cause delay and additional expense and since it was not the fault of the contractor, we think the contracting officer should have suspended the work and an equitable adjustment of the contract price should have been made under Article GC-11. Failing in this, we think the Government is liable.
Of course the Government in this case contends that the decision of the Board of Contract Appeals is final and/or correct legally. It further contends that Article GC-11 of the contract is not applicable under the circumstances.
We do not think under the circumstances of this case that the Board’s decision was final. What we have said previously indicates clearly that we are now confronted with a question of contract interpretation and as such it is a legal question on which the decision of the Appeals Board is not final. The question, therefore, of the legality and correctness of the Board’s decision is not binding on the plaintiff in this case, and in any event we do not believe the question was correctly decided by the Appeals Board.
Defendant then contends that plaintiff should have invoked the procedures of the Labor-Management Belations *188 Act of 1947, 61 Stat. 136 (Taft-Hartley Act) relative to the work stoppage. Defendant argues that by invoking the above Act, some sort of injunctive action would have ensued thereby mitigating any damage to plaintiff.
We have no way of knowing whether an injunction would issue against picketing as constituting a “secondary boycott.” Authorities differ on what constitutes a secondary boycott. Mr. Harold Weston, called as a legal expert by the Government on this issue in the hearing before the Corps of Engineers’ Appeals Board, testified that in his opinion the picketing constituted an enjoinable secondary boycott. Professor William R. White, of Fordham Law School, called as a witness for plaintiff, testified that it did not. However, in any event, the strike was not against the contractor, it was against the Government in its use of civil service employees. The contractor was merely an innocent bystander. Furthermore, we are certain that times necessary to file proper proceedings and ensuing legal maneuvering would take at least as much time as the actual delay caused by the strike. Moreover, the burden of proof with respect to a plaintiff’s asserted failure to mitigate damages rests upon the defendant who asserts it. 134 A.L.R. 242.
We conclude, therefore, that plaintiff is entitled to recover, and judgment is entered to that effect.
Plaintiff’s motion for summary judgment is granted, and defendant’s cross-motion is denied. The amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court.

 “GC-10 POSSESSION PRIOR TO COMPLETION: Tie Government shall have the right to take possession of or use any completed or partially completed part of the work. Such possession or use shall not he deemed an acceptance of any work not completed In accordance with the contract. If such prior possession or use by the Government delays the progress of the work or causes additional expense to the Contractor, an equitable adjustment in the contract price and/or the time of completion win be made and the contract will be modified in writing according * *

 “GC-11 SUSPENSION OF WORK: The Contracting Officer may order the Contractor to suspend aU or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government, unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss not due'to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed for the Contractor, provided however, that the suspension was not due to the fault or negligence of the Contractor. Provided, further, that no suspension will be ordered or adjustments made under this paragraph for delays arising as the result of changes ordered or as the result of changed conditions encountered under the respective articles relating to Changes and Changed Conditions or as the result of any delays for such an extension of time as may be granted under the Delays-Damages Article of this contract.”