**MERRITT–CHAPMAN & SCOTT CORPORATION**

v.

**The UNITED STATES.**

**No. 44–66.**

United States Court of Claims.

July 15, 1970.

Thomas B. Treacy, New York City, attorney of record, for plaintiff. Eugene Schaffel and Jarvis & Piltz, New York City, of counsel.

Edward J. Friedlander, Washington, D.C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, of counsel, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This Wunderlich Act suit was referred to Trial Commissioner Louis Spector for preparation and filing of his opinion and recommended conclusion of law. The commissioner has done so in a report dated February 25, 1970. The Government has requested review. The plaintiff supports the commissioner's report. The case has been submitted to

the judges on oral argument and briefs. We agree with Commissioner Spector.

■ Wholly apart from the Suspension of Work clause, it is established that under the Changes and Changed Conditions articles the equitable adjustment can include increased costs which were the direct and necessary result of the change or the changed condition, where that condition or change directly leads to disruption, extra work, or new procedures. See Paul Hardeman, Inc. v. United States, 406 F.2d 1357, 186 Ct. Cl. 743 (1969); Ivey Bros. Constr. Co., Eng. BCA No. 1764 (1960). At least a portion of the claimed cost increase in this case—it is unnecessary to determine how large a portion—falls within this class and would be recoverable even if a Suspension of Work clause had been omitted from the contract.

■ A Suspension of Work provision was included, however, and under that clause the remainder of the cost increase, to the extent properly proved, can be recovered in this proceeding. There is no doubt, as the trial commissioner holds, that the work was in fact suspended and delayed for the Government's convenience, and also that there was a significant change in design. It is immaterial, in this instance, whether or not the suspension and delay was due, in whole or in part, to the Government's fault. There are occasions for the Suspension of Work clause to operate when the Government is at fault, as we recently noted (See Chaney & James Constr. Co. v. United States, 421 F.2d 728, 731–733, 190 Ct.Cl. 699, 705–708, (Feb. 1970)), but the clause can likewise be effective, as we have also held, when there is a suspension not due to the Goverment's fault, dereliction, or responsibility. See T. C. Bateson Constr. Co. v. United States, 319 F.2d 135, 162 Ct.Cl. 145 (1963); John A. Johnson & Sons v. United States, 180 Ct.Cl. 969 (1967). An instance of the latter category is a suspension and delay which lasts so long (regardless of the absence of government fault) that the contractor cannot reasonably be expected to bear the risk and costs of the disruption and delay. That is one type of suspension and delay "for an unreasonable length of time causing additional expense", within the meaning of the clause. Depending on the circumstances, a delay due to a non-fault suspension by the Government can obviously be so protracted that it would be unreasonable to expect the contractor to shoulder the added expense himself. We think that in its terms and its purpose the Suspension of Work clause covers that situation, among others.

The trial commissioner has properly concluded that that is the situation here. On this record, and with this project, it is impossible to hold other than that the delay-due-to-suspension of 419 days (considerably more than one year)[*] was "for an unreasonable length of time." The contractor, informed by the Suspension of Work article that it would receive compensation for unreasonable delays due to a non-fault suspension, would not expect (and rightly so) to bear the costs of a delay of this character and magnitude. The delay was therefore "unreasonable". There is no finding by the Board, and defendant does not claim, that some lesser part of this 419 days would have been a "reasonable" delay (cf. Chaney & James Constr. Co. v. United States, 421 F.2d 728, 735–736, 190 Ct. Cl. 699, 712–713 (Feb. 1970)). In any event, the circumstances of the case would preclude a finding that any delay after April 20, 1960, would have been a "reasonable" one for which plaintiff should bear the extra expense.

The court understands Commissioner Spector's opinion to be fully consonant with this analysis of the case, and therefore adopts his opinion (in the light of and as supplemented by the foregoing discussion) as the basis for judgment.

---

[*] Defendant no longer contests the determination that the delay amounted to 419 days, from April 20, 1960, to June 12, 1961.

Accordingly, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution of the additional adjustment in contract price to which plaintiff is entitled. With respect to the plaintiff's claim for an extension of time of 419 days, in lieu of the 365 days allowed by the Board, it is held that there is no support in the record for a finding that plaintiff was delayed for any lesser period than that represented by the suspension of the central features of this project (the dam) from April 20, 1960, to June 12, 1961, and therefore that plaintiff is entitled to the additional claimed extension of 54 calendar days.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

 This is a contract claim in the approximate amount of $2,000,000,[1] arising out of the construction by plaintiff of a dam and outlet works, power intake works and roads at Cougar Reservoir on the South Fork of the McKenzie River in Central Eastern Oregon. The contract, in the original estimated amount of $23,-985,564, was executed June 9, 1959, and administered on behalf of defendant by the Army Corps of Engineers. The claim has heretofore been the subject of a decision by that agency's contracting officer and board of contract appeals.[2] Therefore, to the extent that it is a decision on a question of fact, it is subject to review by this court against the record compiled by the agency.[3]

Generally, the issue presented involves the adequacy of the adjustment in contract price and time of performance allowed by defendant under the circumstances hereinafter described. At issue are the contract clauses entitled GC-11, "Suspension of Work"[4]; Article 4, "Changed Conditions"[5]; and Article 3, "Changes."[6] As the opinion of the Engineers Board of Contract Appeals states at the outset, "[f]actually the matter is not too complicated."

Cougar Dam was constructed in very rugged country across a narrow river

1. The precise amount is not presently at issue before the court.

2. This is a so-called "civil works" contract of the Army. The "Disputes" article therein contained provides for appeal from an adverse decision "concerning a question of fact" to the Secretary or his duly authorized representative, and the latter is defined as the "Chief of Engineers, Department of the Army, or an individual or board designated by him." The decision of the latter "shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. * * *

"(b) This 'Disputes' clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, That nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

3. The Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 ed.), as interpreted by United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L. Ed.2d 652 (1963). See also United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) and United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

4. Authorizing the contracting officer to suspend all or part of the work for the convenience of the Government, and requiring an adjustment of contract price and time of performance under the circumstances described therein.

5. Providing for an equitable adjustment of contract price and performance time should the contractor encounter subsurface or latent physical conditions at the site differing materially from those indicated in the contract.

6. Authorizing the contracting officer to make changes in the contract drawings and specifications within the general scope of the contract and providing for an equitable adjustment of contract price and time of performance.

valley flanked by hills which rise precipitously to a height of about 700 feet on either side of the river. The top of the dam is about 519 feet above the existing river bed (which occurs at about elevation 1270). It had been designed by the Army Engineers Corps and its consulting engineers as a rock fill structure with an impervious core consisting of rock fragments or gravel with a sandy clay or silt binder, backed by a gravel transition zone and various zones of spall and rock both upstream and downstream. The designers, after long study, selected a rock fill type of dam because of the above described physical conditions at the site, and because large quantities of rock were readily available from the hills in the immediate vicinity.

Cougar Dam is the highest rock fill in existence, and the second highest rock fill type dam. "Preliminary subsurface investigations were made by the Government which indicated to the designers that a suitable foundation formation for the type of dam contemplated would be found at approximate elevation 1260.[7] Due to the type of dam selected, it was not considered necessary to carry the foundation to rock over the entire dam site. The contract drawings indicated that in general a suitable formation, consisting of a cemented gravel,[8] would be found at elevation 1260 with local variations and some pot holes which might or might not have to be excavated to lower elevations to obtain a suitable foundation. The drawings did not call for the foundation excavation across the floor of the valley to be carried to a fixed elevation but did indicate the approximate elevation with the note 'Remove vegetation, topsoil and gravel as may be directed.' "[9]

The specified completion date for the dam was November 1, 1962. Because of the heavy seasonal rainfall in this geographical area, the normal core placement season was limited to the period from mid-May to mid-September. The contract having been executed on June 9, 1959, plaintiff contemplated that three core placement seasons would be available (1960, 1961 and 1962), with the work to be accomplished in two 10-hour shifts for the 5-month period above-mentioned, and in one 5-hour shift during the remaining 7 months of each year. At the outset, plaintiff mobilized machinery, plant and equipment valued at between 5 and 6 million dollars to meet this schedule. The contract required plaintiff to submit its plan for diversion of the river, and plaintiff submitted such a plan. The plan contemplated diversion by April 1, 1960, through construction of a coffer-dam upstream; excavation of the core trench by June 15, 1960; and the raising of the dam embankment to elevation 1390 by November 15, 1960. This river diversion plan, and plaintiff's overall progress schedule, were both approved by the Government. A provision of the contract relieved plaintiff from responsibility for damage to the work caused by overtopping, once a portion of the rock fill dam had been raised to elevation 1375. As can be observed from the above, the approved plans contemplated reaching that elevation during the 1960 construction season.

Work started in June 1959, and continued for the remainder of that season, and during the winter. By April 20, 1960, plaintiff had excavated the greater portion of the upstream foundation area (except for the river bed area which had to await diversion) to a suitable and approved foundation material. It had by that date placed 336,000 cubic yards of rock fill in part of the upstream foundation area, as authorized by the Government. Diversion of the river was accomplished, approximately on schedule, by April 18 and 19, 1960. The contract drawings required the core trench exca-

7. That is, about 10 feet below the existing river bed.

8. A term used to describe naturally dense and compact gravels.

9. This quotation is from the Corps of Engineers Board decision, made as mentioned in note 2.

vation to be completed to rock between dam axis stations 17+30 and 20+30. Concurrently, downstream of the core trench, plaintiff had been proceeding with the development of the quarry through the removal of overburden and construction of haul roads, the excavation for the intake structure and regulating outlet tunnel, and other related work which would generate rock necessary for the raising of the rock fill dam embankment.

During late January or early February 1960, it was observed that a red material was pumped to the surface of the haul road by the equipment passing over it, in the foundation area downstream of the axis of the dam. When this condition was called to the attention of the Government, the Resident Engineer directed the excavation of a certain area which uncovered a pot hole containing unsuitable material. He then directed excavation of two exploration trenches. A Mr. Robert Pope, soils engineering expert for the Government, visited the project in mid-February 1960, and examined these trenches. Thereafter, on March 2 and 3, he and 18 other high Government representatives examined the foundation conditions and they concluded that a further exploration trench should be excavated at the upstream toe of the dam. The official report of this inspection, stated in part, is as follows:

b. Foundation drill holes indicate the presence of certain deep areas below the average foundation plane. It was considered important that during the course of excavation it is definitely determined whether the low areas are isolated potholes or there exists a continuous trench. The extent of excavation of gravels from deep potholes or *an old channel* will depend on the shape and location of such deep deposits. [Emphasis added.]

c. The deleterious material could well be contained in foundation gravels upstream of the core and upon which the embankment has been raised to approximately elevation 1328. The effect of a clayey gravel foundation upon the upstream stability of the dam will depend upon the percentage of clayey material contained and the areal extent and depth of the contaminated material.

d. Investigative work to determine the nature of the upstream foundation should consist of a trench excavated to the water table along the upstream toe of the embankment. The trench should have sufficient width to accommodate a drill rig. Several borings should then be made as required from the trench to define the top of rock profile at the embankment toe.

e. Corrective measures, if required, would be based on information obtained from the explorations. Solutions considered consisted of a toe berm of required random excavation; a rock filled toe trench and berm upstream of the present toe; or removal of a portion of the material already in place and stripping the gravels to suitable foundation before replacing the rock fill.

On March 18, 1960, the contracting officer wrote plaintiff forwarding a draft of additions to specifications and sketches to be incorporated into revised drawings for the work, and plaintiff responded with a price proposal on March 31, 1960. On April 7, 1960, plaintiff was directed to proceed with the upstream exploratory trench and with the drilling of percussion exploratory holes. This work commenced April 19, 1960, and was completed May 13, 1960. On April 25, 1960, plaintiff stated by letter that a changed condition had been encountered [10] and noted the possibility that an old river gorge had been encountered. It observed that its plans for systematic raising of the dam were being frustrated, that its equipment was being employed inefficiently, that it was being engaged in exploration (as distinguished from construction) work, and that it was being delayed. It requested

---

10. See note 5 *supra.*

a contract modification. The contracting officer, on April 27, 1960, denied the existence of "Changed Conditions," and further denied any extension of contract performance time.

As plaintiff expresses it, at this point "there commenced a series of operations which brought to a standstill all forward progress in the raising of the dam embankment and resulted in a retrogression of progress, from which recovery was not accomplished until June 12, 1961." The board opinion, heretofore mentioned, expresses the same thing as follows:

> * * * Through progressive letters to the contractor, the Government instructed the contractor to extend the excavation of the suspect material until the limits of the unsuitable formation would be determined. It was finally found that an ancient river gorge existed below the level of the present river bed which extended from the downstream to the upstream toe of the proposed dam and which was some 80 feet deeper than the presumed acceptable foundation formation at approximately elevation 1260. * * * Due to the extra excavation required by the existence of the ancient river channel, the planned progress of the contractor during the summer of 1960 was disrupted. Placement of rock fill in those areas deemed suitable, prior to uncovering the ancient river channel, was stopped and a part of the fill already placed had to be removed when it was found that the channel extended under a portion of the fill area. * * *

Because plaintiff felt that the extent of the ancient river channel was quite well delineated by May 1960, it deplores the fact that the Government "refused to acknowledge a changed condition and the directions to proceed with correcting the changed conditions were still on a piecemeal basis." There are of record about 16 change orders dealing with this problem. Plaintiff felt that an analysis of the problem, followed by a single redesign and direction to proceed with corrective action, coupled with authority to work overtime (which was refused), would have greatly mitigated the delay and disruption which it suffered. Instead, change orders were issued and negotiated one at a time, and without any sense of urgency. These are recounted in detail in the record. They included, for example, additional handling of some of the 182,000 cubic yards of rock which had been previously placed in the dam embankment, and removed to permit further exploration when it was discovered that the stockpiled rock was endangering the upstream coffer-dam.

By way of further example, it was by letter of July 11, 1960, that plaintiff was advised:

> It has been definitely decided that a concrete plug will be placed in the buried channel in bedrock for the full width of the core at about elevation 1270. You are requested to furnish this office a price Proposal for this proposed concrete work. The most economical approach to this work is desired and for this reason definite specifications for the work will be withheld until the methods most advantageous and expeditious can be determined through discussions between you and this office.

In reply to this, dated July 28, 1960, plaintiff observed in part as follows:

> The additional work involved in the removal of the material in the confined area of the core trench, as well as the proposal outlined in your Serial Letter No. 177 for a concrete plug to be placed in lieu of impervious core material in this area of the deep channel within the limits of the core trench, changes entirely the scope of work from that originally intended to be performed in preparation of foundation for the impervious core. * * *

Controversy developed on this matter when the Government instructed plaintiff to proceed with excavation in the core "as required under the terms of the contract" and at existing unit prices. This controversy was not settled until

Change Order 43, dated May 23, 1961, was issued to plaintiff. It contained, incidentally, the following reservation by plaintiff:

> . The enclosed Modification No. 43 (Initial) (Revised) is further signed and transmitted to you upon the condition and understanding that by our signature thereto we do not waive, but expressly reserve the right to claim and receive an equitable adjustment of Contract price should the performance of the work contemplated thereby, either alone or in conjunction with the performance of work under other Change Orders or Contract Modifications, whether heretofore or hereafter issued, or by reason of the cumulative effect thereof, result in increased costs or expenses either to us or to Subcontractors to whom we may be or become contractually liable therefor in the performance of other features of our Contract work by reason of delay, or for any other reason, and that the amount of any such increased costs or expenses is not included in or taken into account in the prices heretofore quoted for the work covered by Modification No. 43 (Initial) (Revised).

This reservation is similar to reservations made as to all plaintiff's claims resulting from the changed conditions. The excavation of the ancient river channel was finally completed August 17, 1960, after removal of about 588,000 cubic yards of material. Placement of the concrete core plug above described was ordered on August 24, 1960, and completed on September 28, 1960. Plaintiff became concerned over its ina-

bility to raise a portion of the dam to elevation 1375 with consequent relief from responsibility for flood damage, as earlier mentioned. After considerable correspondence, the Government, on October 12, 1960, authorized certain remedial work to protect against overtopping. The discovery of a secondary ancient river channel also required the removal of dam embankment already placed, excavation to rock, and replacement with suitable material. This remedial work was completed November 1, 1960.

Despite the aforementioned remedial work to prevent or minimize flooding, a flood did occur on November 24, 1960. It effectively prevented removal of water and silt until March 15, 1961. It was not until June 12, 1961, that plaintiff was in the same position, with respect to the raising of the actual dam, as it had been on April 20, 1960, when the changed condition was encountered. Embankment placed before and after April 20, 1960, had been required to be excavated and removed to the extent of 182,000 cubic yards, requiring in some cases three movements of the same material by the time it was back in place. Other incidental work schedule to proceed simultaneously with the raising of the dam, did in fact go on, but this did not advance completion of the project which was effectively controlled by the progress of the dam, the central feature of the project. In summary, plaintiff submits that a constructive suspension[11] of all important work of raising the dam embankment occurred on April 20, 1960, which prevented all forward progress throughout 1960, and that this suspension did not terminate until June 12, 1961,

---

11. The full text of the clause mentioned in note 4, is as follows:

"GC–11 SUSPENSION OF WORK— The contracting officer may order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense to the contractor, no increase in the contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense, not due to the fault or negligence of the contractor, the contracting officer shall make an adjustment in the contract price in the amount of the additional proper expense and modify the contract accordingly. An extension of time for the completion of the work in the event of any such suspension will be allowed the contractor; provided however, that the suspension was not due to the fault or negligence of the contractor."

when plaintiff was finally able to regain its position of forward progress at the time of the suspension.

The Corps of Engineers Board of Contract Appeals does not take issue with this. It too concluded that "[d]uring this period it was not possible to make any significant progress in placing rock fill in the embankment as the original progress schedule contemplated, since the core of the dam could not be constructed until the ancient river channel had been plugged and the upstream and downstream reaches of the channel had been backfilled with suitable material."

The board also observed that "this extra work prevented the work contemplated in the placing of embankment and required a slow down and change in method of development of the rock quarries due to the lack of embankment space in which to place rock resulting from the development of the rock quarry in the manner originally planned."

The crux of this dispute is then described by the board in these words:

Initially, it does not appear that either party to the contract considered that the removal of the unsuitable foundation material in local areas below the generally stated foundation elevation was either a change in the contract or a changed condition.[12] However, when the nature of the work was developed, i.e. excavation within the confines of the narrow gorge well below the elevation of the remainder of the foundation area and the necessity of placing a concrete plug across the channel under the core area. It became evident that extra work for which new prices were required was being performed. The Contracting Officer considered that this extra work came under the "Changes" clause of the contract[13] and issued contract modifications referring to that clause as authority. The contractor on the other hand maintained that the condition constituted a "Changed Condition"[14] under the contract

12. This is not wholly correct. See the reference in the text at note 10 *supra*, to plaintiff's letter of April 25, 1960, asserting that a changed condition had been encountered.

13. The full text of the clause mentioned in note 6, is as follows:
"CHANGES
"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed."

14. The full text of the clause mentioned in note 5, is as follows:
"CHANGED CONDITIONS
"The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer

and that it was entitled to an equitable adjustment to compensate all costs of the extra work required to overcome the unknown and unexpected condition.[15]

At the hearing held before this Board *it was conceded by the Government that the existence of the ancient river channels within the dam foundation area constituted a "Changed Condition"* but alleged that an equitable adjustment in time and money *had been made by the modifications previously issued,* which established prices for the various types of excavation within the ancient river channels and for the necessary work of backfilling the excavated channels with suitable fill. It is understood by this Board that the appellant does not dispute the adequacy of the prices for *the direct cost* of performing the various items of work mentioned in the modifications but it does allege that the price adjustments *do not cover all the costs* incident to the extra work in that *no consideration is given to the fact that the original contract work was in effect suspended* during the period of time used in excavating and backfilling the ancient river channels *and the incidental loss of an entire core placing season.* The appellant has made claim for an additional 85 days of contract time [16] and for *additional money to compensate for alleged losses due to standby costs for equipment and indirect expenses incident to the delayed completion of the original contract work which were not*

*covered* in the price adjustments made by the Contracting Officer in the series of modifications issued in connection with the correction of the change condition. These modifications have increased the contract price by an amount in excess of $2,000,000 to compensate the appellant for the cost of excavating from the ancient river channels, removing, stockpiling, and replacing fill previously placed in the embankment, placing a concrete plug in the channel in the core area, changing the upstream cofferdam as required in order to prosecute the work in the ancient river channel and to backfill the ancient river channel with suitable material up to approximately elevation 1260. *The Contracting Officer considers the compensation already made as being in full payment for the extra work done and the amount in excess of this compensation claimed by the appellant to be consequential damages which he considers are not compensable under the terms of the contract.* \* \* \* [Emphasis supplied, to highlight the precise issue before the court in this proceeding.]

In its decision, the board agreed with this interpretation of the terms of the contract by the contracting officer, and denied the appeal. Citing the "Suspension of Work" article hereinabove quoted, the board describes plaintiff's position as follows:

The contractor takes a different view of the situation. In essence it is claimed that the existence of the ancient river channel and the perform-

may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof."

15. The relevance of this secondary difference of opinion, to the extent that it occurred, is not apparent. Sometimes a subsurface or "Changed Condition" is encountered which does not require any change whatever in the original design. It merely renders the original design more

costly, and the "Changed Conditions" article affords a vehicle for reimbursing those additional costs. In other cases, a subsurface or "Changed Condition" is encountered which results in frustration of the original design and therefore requires "Changes" therein. In those cases, the "Changes" clause becomes the more appropriate vehicle for adjusting the contract price by reason of the "Changed Condition." Both clauses essentially call for "an equitable adjustment."

16. The contracting officer had previously allowed 334 calendar days.

ance of the work admittedly necessary to make the foundation within the confines of the ancient river channels acceptable for the placement of the rock fill dam constituted a suspension of all work under the original contract and the undertaking of a new and separate obligation for the convenience of the Government. It is the appellant's view that the changed condition gave rise to cessation essentially of all work under the basic contract for a period equal to the time required to overcome the changed condition and to restore the foundation site to the same status it was in at the time the necessity of the correction of the unsuitable foundation area became apparent, i.e. from 19 April 1960 to 12 June 1961.

Appellant's counsel argues that by reason of encountering the changed condition there occurred a partial suspension of the entire contract work and a complete suspension of all the important work of constructing the rock fill embankment which amounts to a de facto[17] suspension of work under Clause GC–11 of the contract, causing additional expense in the amount of $3,689,317.34. * * * He cites Lewis Construction Co. ASBCA No. 5509, 60–2 BCA Para. 2732, and makes reference to Morrison Knudsen Company, Inc., Eng BCA 1867.

The board rejects this interpretation of the "Suspension of Work" article. It states:

This Board does not consider that the Morrison-Knudsen case is in point with the instant case because of the factual situation. The Morrison-Knudsen case arose in connection with work which was performed in the far North where conditions were such that the work season was very limited

and the work itself was of such nature that an extremely short completion time was allowed. When the changed condition was encountered, it caused the contractor's schedule to be completely revised and the Government's necessity for the facility caused certain work to be performed in unsuitable winter weather rather than being deferred to the next construction season. In effect, the contractor was required to complete the original contract work in an entirely different season than that in which he would have been entitled to perform such work under normal contract administration procedures such as usually prevail. In the instant case an extension of time permitting performance of the work during a suitable season of the next year was allowed.

Responding to an additional argument of the contractor that it was entitled to all its costs flowing from the above described circumstances, because the Government in effect breached the contract by furnishing the contractor defective plans and specifications,[18] the board stated:

This approach requires this Board to ignore the Changed Conditions clause of the contract and to absolve the contractor from any responsibility under the General Condition, GC–3, Site Investigation. The appellant does not charge the Government with failure to make the results of the subsurface investigation available for inspection or to have failed to make all information available to the contractor. * * * Thus, the parties having agreed there exists a changed condition, there is no basis for holding that the condition was outside the contemplation of the parties to the contract, or that the Government is required to suspend the work for its

---

17. This is more often described as a "constructive" suspension to distinguish it from one in which the contracting officer has issued a formal written suspension order pursuant to the "Suspension of Work" article.

18. *Cf.* Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963).

own convenience to redesign the foundation. In fact the foundation constructed was essentially the same as that originally designed, albeit to a lower elevation within the confines of the ancient river channel, and with the impervious core partly of concrete in its lower lifts rather than of compacted impervious fill material.

Even though the contractor encountered a changed condition, the possibility of which was anticipated and provided for by inclusion of a changed condition clause in the contract, there might still be a showing of a suspension for the convenience of the Government if the facts were such as to show that the Government did not take reasonable steps within a reasonable time to investigate and authorize changes in the work necessary to meet and overcome the actual condition encountered. However, in the instant case this situation does not exist. * * * On the record, this Board is not convinced that the issuance of a single change order in April 1960 would have enabled the contractor to use the equipment more efficiently or to have shortened the period necessary to develop and correct the changed condition.

From the foregoing, this Board finds that there was no suspension of work within the meaning of Clause GC–11 under the contract.

The board further concluded that plaintiff was entitled to an additional extension of contract time, but not to the full extent claimed. It extended the time allowance of the contracting officer from 334 to 365 calendar days.[19] Having found no suspension within the meaning of the "Suspension of Work" clause, the board further concluded that the contract price adjustments already made under the "Changes" clause[20] adequately compensated plaintiff for its direct costs. "However," it stated, "testi-

mony at the hearing indicated that the overhead rate allowed by the Government on the direct cost was grossly inadequate when compared to the contractor's overhead rate experience on the project and its usual overhead rate experience in general. * * * " The board decision continues as follows:

This Board has held in Ivey Brothers Construction Co., Inc., Eng BCA 1764 as follows:

There is no more well established or often repeated principle of Government contract law than that adjustments under the CHANGES article are limited to the costs involved in the changed work. It does not include damages for delays to the remainder of the work not changes [sic]. This principle was established by the Supreme Court [sic] in Rice [U. S. v. Rice] v. U. S., 317 U.S. 61 [63 S.Ct. 120, 87 L.Ed. 53]; Choteau [sic] v. U. S., 95 U.S. 61 [24 L.Ed. 371]; Crook Co. v. U. S., 270 U.S. 4 [46 S.Ct. 184, 70 L.Ed. 438]. It has been followed by the Court of Claims, Mount Vernon Contracting Corp. v. U. S., 153 F.Supp. 469 [139 Ct.Cl. 688]; Magoba Construction Company v. U. S., 99 Ct.Cls. 662. It is followed repeatedly and consistently by the Appeals Board, Norair Engineering Corporation, ASBCA 3527; 57–1 BCA, Par. 1283; Charles H. Tompkins Co., C & A Nos. 685 and 768; Sanders, BCA 1468, 4 CCF, Par. 60, 526; Gerwick, et al, ASBCA 158, 5 CCF Par. 61, 461; H. R. Henderson, Inc., et al, C & A 1170; Lewis Construction Company, C&A 1271; McGough, Eng BCA 1524. The claim for supervisory and overhead costs is predicated directly upon delays to the unchanged work, and is not compensable.

Although the above quotation refers to the Changes article, the same rule applies to the Changed Condition article since both articles require an eq-

19. The contractor had claimed 419 days, from 20 April 1960 to 12 June 1961, as earlier indicated.

20. Note 13 *supra.*

**442**

uitable adjustment and there is no difference as to what constitutes an equitable adjustment as between the two articles.

Inasmuch as it has been found that there was no suspension of work, there is no basis for making an adjustment in the contract price to compensate for delay to that part of the work not changed. However, in view of the lack of testimony as to the adequacy of the overhead rate allowed on that part of the work that was changed, the file is remanded to the Contracting Officer for a determination on this facet of the matter. This Board considers that in making this determination the Contracting Officer should consider the actual overhead rate experienced by the contractor on the work and if he finds such rate reasonable, to allocate to the changed work that part of the overhead represented by the ratio which the total revenues from the changed work bears to the total work performed during the one year in which the changed condition was encountered.

 In thus denying plaintiff the opportunity to have considered all of the additional costs flowing from the above described circumstances, the Corps of Engineers Board was essentially making a decision on an issue of law. As clearly demonstrated by a reading of that decision, it hinges upon an interpretation of three contingency-removing clauses regularly employed by the Government in its standard construction contract form. These clauses have heretofore been treated with in a host of adjudicated cases. The facts are essentially undisputed, and the versions narrated by the parties differ, understandably, only in emphasis. Plaintiff points out in its brief that it disputes "the adequacy of the prices for the direct costs of performing the various items of work mentioned in the modifications because it has been and is the plaintiff's position

that the costs incident to the extra work as a result of the suspension are recoverable either under the Suspension of Work Clause or as direct costs of the work under the Changes or Changed Conditions Clause."

For the reasons hereinafter set forth, it is concluded that this position stated by the plaintiff is correct, and that the decision to the contrary by the contracting officer and the board is in error as a matter of law. That decision ignores the plain words of the clauses themselves, clauses which have been drafted by the Government. It is, furthermore, contrary to the weight of authority interpreting those clauses in this type of factual situation.

The description by the board of its own prior decision in *Morrison-Knudsen*, as quoted above, reads very much like a factual description of this case, and the distinction between the two cases, which the board then seeks to draw, is nebulous and hardly persuasive. In *Morrison-Knudsen*, as in this case, when the changed condition was encountered, "it caused the contractor's schedule to be completely revised * * * [and] * * * the contractor was required to complete the original contract work in an entirely different season than that in which he would have been entitled to perform such work under normal contract administration procedures such as usually prevail." To afford relief in the one case, and not the other, by self-imposed restrictions on the application of the "Suspension of Work" clause, is too subjective an approach to be supported by a plain reading of that clause.

Similarly, the other agency decision mentioned in this board's decision,[21] is indistinguishable from the case at bar. In the *Lewis Constr. Co.* case, the Armed Services Board of Contract Appeals held:

With respect to appellant's request for an equitable adjustment, pursuant to the "Suspension of Work" articles,

21. Lewis Constr. Co., ASBCA No. 5509, 60–2 BCA ¶ 2732. This case is not further developed nor distinguished in the board's decision.

seeking compensation for delays caused by the failure to provide adequate specifications for the boiler foundations, the record discloses that work was in fact stopped for want of proper specifications. A modification to the contract states that revision of boiler room foundations, to meet the requirements of the boiler furnished, was made. A letter written by the Government resident engineer requested that appellant "continue to postpone further work on the affected portions of the building," and advised appellant that a "formal stop order" would be issued if correction was not made in the near future. The record also indicates that appellant was delayed for at least four or five weeks. [at p. 13,855]

After quoting the "Suspension of Work" article in *Lewis,* the ASBCA continued:

We attach no import to the fact that no stop order has been issued by the Government. We have held, in T. C. Bateson Construction Company, ASBCA No. 5492, decided 16 March 1960, 60–1 BCA, par. 2552, and decisions cited therein, that the "Suspension of Work" article is for application when a *de facto* suspension of work is caused by acts of the Government. Hence, the mere absence of a formal stop order is no bar to recovery.

The evidence clearly establishes that the work was in fact stopped and that the stoppage was the result of acts of the Government. We find the specifications furnished by the Government were in fact faulty. The contract required performance in strict accordance with specifications and drawings furnished by the Government. Therefore, upon discovery of inadequacies of the specifications and drawings, appellant was compelled to stop work and await correction of the deficiencies contained in the specifications and drawings. * * * Appellant is entitled to an equitable adjustment compensating it for additional expenses incurred, to the extent they are reasonable, and for losses suffered as a direct and natural consequence of the delays caused by the faulty specifications. [at p. 13,856]

This case is virtually "on all fours" with the *Morrison-Knudsen* and *Lewis* cases described above, and it seems arbitrary to decline to apply the "Suspension of Work" clause in this case, after it was administratively applied in those two cases. In the case before the court, the foundation originally planned was deemed to be "unsuitable" by the Government. The initiative of determining whether to proceed, and how to proceed at that point, lay with the Government, not with plaintiff. The contractor could have proceeded as originally planned, if it had been permitted to do so. Instead, the Government elected in effect to suspend construction of the dam, and then to engage the contractor for a substantial period of time in exploratory work designed to determine the extent of the problem, and how best to proceed from there.

This was a classical example of the type of factual situation for which the "Suspension of Work" clause was apparently created because it authorized the contracting officer to "order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government." Absent that clause, it is doubtful that the Government could have stopped the contractor's performance, without being chargeable with breach. When the contractor, as here, is effectively suspended but the contracting officer has declined to issue the actual order of suspension, "the law considers that done which ought to have been done" and characterizes the circumstances as a constructive (or de facto) suspension. See, for example, John A. Johnson & Sons, Inc. v. United States, 180 Ct.Cl. 969 (1967); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963), where a breach was found, in the absence of a "Suspension of

Work" clause providing an administrative remedy;[22] Stagg Constr. Co., GSBCA No. 2664, 69–2 BCA ¶ 7914 (1969), and the above-cited agency decisions in *Morrison-Knudsen* and *Lewis*, as examples of relief afforded under that clause where the contract contained such a "Suspension" clause.[23] These are all typical examples of the Government's having to suspend the mainstream of the work in order to effectuate a necessary change in design.

There is no support in the record for the board's suggestion that there was in this case no change in design of the foundation, "albeit [it was constructed] to a lower elevation within the confines of the ancient river channel and with the impervious core partly of concrete in its lower lifts rather than of compacted impervious fill material," at an admitted additional cost of about $2,000,000, and the loss of an entire construction season. That expression of opinion is patently incorrect, as demonstrated by a mere recital of the facts. There is support for plaintiff's contention that "[t]his method of operation converted plaintiff from a contractor for the construction of Cougar Dam and Outlet Works into a foundation exploration agency of the Government and wholly prevented it from performing the most important element of its Contract work, namely, the raising of the dam embankment."

Plaintiff also contends, as an additional argument in support of its case, that the board was in error in refusing to consider all of the cost consequences suffered by plaintiff under the "Changed Conditions" clause.[24] The board held that "[i]n the instant case an extension of time permitting performance of the work during a suitable season of the next year was allowed." It refused, however, to allow any of the costs flowing from these circumstances, relying on the so-called "Rice" doctrine as summarized in its decision in *Ivey Bros. Constr. Co.*, above quoted. The so-called "Rice" doctrine does not constitute a bar to consideration of the costs at issue in this case, and the board was in error in declining to consider them under the "Changed Conditions" and "Changes" clauses of the contract, as it was in earlier refusing to afford relief under the "Suspension of Work" clause.

Firstly, United States v. Rice, 317 U. S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), and the other cases above-cited as com-

---

22. As explained in *Utah, supra,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

23. See also the recent decision in Chaney & James Constr. Co. v. United States, 421 F.2d 728, 190 Ct.Cl. 699 (1970) ; T. C. Bateson Constr. Co. v. United States, 319 F.2d 135, 162 Ct.Cl. 145 (1963) ; Wunderlich Contracting Co. v. United States, 351 F.2d 956, 173 Ct.Cl. 180 (1965) ; Jack Clark, ASBCA No. 3672, 57–2 BCA ¶ 1402. In the *Bateson* case 319 F.2d at 158, 162 Ct.Cl. at 185, the court stated:

"At the outset, we are of the opinion that there was no breach of the contract by the Government. What the Government did with respect to putting civil service employees on the job was within the terms of the contract. This is not to say, however, that the Government could take refuge in the contract provisions and perform acts which it knew would delay and hinder the contractor in the performance of the work. In other words, in our opinion, the Government had the right to do any act within the terms of the contract, but if said action caused plaintiff delay and damages it follows that under certain circumstances the Government is liable to the contractor therefor.

\* \* \* \* \* \*

"Article GC–11 of the contract was designed to incorporate and go beyond the principle that it is an implied provision of any contract that neither party will do anything to prevent performance thereof by the other party or will hinder or delay him in his performance. George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, 94; Restatement of the Law of Contracts, sections 295, 315; Williston on Contracts, sections 677, 1318; Chalender v. United States, 119 F.Supp. 186, 127 Ct. Cl. 557, 563; Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454, 470."

24. Note 14 *supra.*

prising the "Rice" doctrine,[25] contained somewhat different language in the "Changed Conditions" (and "Changes") article, than is found in this contract. The *Rice* "Changed Conditions" article required the contracting officer to make changes under the "Changes" clause and provided that "any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted * * *." The "Changed Conditions" clause in this case requires the contracting officer to grant an equitable adjustment if the conditions discovered "cause an increase or decrease in the cost of, or the time required for, performance of this contract * * *."

Secondly, and more importantly, none of the "Rice" doctrine cases contained a "Suspension of Work" clause, as was present in this case. That clause was inserted for the express purpose of permitting the Government to "order the contractor to suspend all or any part of the work for such period of time as may be determined by [it] to be necessary or desirable for the convenience of the Government," provided that it made a corresponding adjustment of the contract price. As above explained, that is exactly what transpired in this case, and why it has been determined above that the "Suspension of Work" clause is for application. The cases cited above in support of this determination involved, for the most part, factual situations which dictated a formal or constructive suspension of the work, to permit the Government to effect a redesign necessitated by unworkable plans, or by the discovery of a changed condition. They are to be distinguished (for the purpose of applying the "Suspension" clause) from those factual situations where no suspension of the work was required, and the contractor was able to complete the contract exactly as originally designed, albeit more slowly because of an encounter with a changed condition.

Thirdly, even absent a "Suspension of Work" clause, the "Rice" doctrine has not been uniformly applied to bar consideration of so-called "indirect" or "delay" costs. They have in fact, been found in various situations to be "direct" costs in the sense that they flow directly from the act or omission supporting a claim. *Laburnum Constr. Corp.*, *supra,* is an example of this.[26] There defective specifications, necessitating changes and resulting in delays, were found to be a breach. Similarly, plaintiff cites the Engineers Board of Contract Appeals in Ivey Bros. Constr. Co., Eng BCA ¶ 1764 (partially quoted by the board in this case), as an illustration of contract adjustment for so-called "indirect" or "delay" costs. See also, Cosmo Constr. Co., 66–2 BCA ¶ 5736 (Interior Dept. Board), and Hardeman-Monier-Hutcherson, 67–1 BCA ¶ 6210 (Armed Services Board). In the latter case, where the board found that steel was wrongfully rejected, resulting in a constructive change, the contractor was allowed all standby or delay costs which unavoidably followed as a result of the change. The type of costs allowed in that case closely parallel those which have been denied consideration in this case.[27]

It is noteworthy that the so-called "Rice" problem has now been eliminated, by revisions of the "Changes" and "Changed Conditions" clauses to make it clear that the equitable adjustment referred to therein is intended to include the additional cost of performing the

---

25. H. E. Crook Co. v. United States, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438 (1926); Chouteau v. United States, 95 U.S. 61, 24 L.Ed. 371 (1877).

26. See also Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966).

27. The *Hardeman* decision reviews several other court and board opinions on this point. See also I. K. Constr. Enterprises, ASBCA 10987, 67–1 BCA ¶ 6271.

work whether "changed or not changed." [28]

No mention has heretofore been made of extensive arguments also submitted by plaintiff to support the theory of a breach of contract by the Government in this case. Plaintiff argues, in brief summary, that the board erred as a matter of law in not finding that the Government had a duty and legal obligation to furnish to the contractor specifications and drawings sufficient for the purpose intended.[29] It further argues that the Government was careless in not having conducted a more complete subsurface exploration before letting the contract, and that it in fact conducted certain seismic explorations, the results of which it did not divulge to bidders. It is also suggested that a change of this magnitude constituted a "cardinal" change,[30] and therefore one beyond the scope of the "Changes" clause, and in breach of that clause. In either case, if a breach occurred, plaintiff would traditionally be entitled to all costs flowing from the breach, and the "Rice" doctrine would have no application whatever.

It is not necessary to treat with this additional "breach" theory of relief, in light of the conclusions expressed above that plaintiff is entitled to relief under the plain meaning of the "Suspension of Work" clause, and that such relief is not interdicted by the so-called "Rice" doctrine.

## CONCLUSION OF LAW

Plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution by the agency of the additional adjustment in contract price to which plaintiff is entitled.[31] With respect to the plaintiff's claim for

---

28. 41 Code of Federal Regulations § 1–16.901–32 reflects this revision for the Standard (Supply Contract) Form 32, effective with the June 1964 edition. The revision in the Standard (Construction Contract) Form 23A is published in 32 Federal Register 16268, et seq. In an appendix to the latter, entitled "Background and Nature of Revisions to Contract Clauses," it is stated:

"a. For many years problems have been encountered in the administration of these clauses. A study of the problems was initiated by GSA on June 18, 1964. The Study Group (which included the representatives of major construction contracting agencies) submitted a report on March 1, 1966, in which it set forth basic objectives, analyzed administrative difficulties, and recommended revised contract clauses. Included in the basic objectives were:

"(1) Clarification of the authority of the contracting officer with respect to the making of changes.

\* \* \* \* \* \*

"(3) Elimination of the adverse effects of the 'Rice' doctrine (insofar as it has been interpreted to preclude appropriate consideration of the effect of a change upon affected aspects of contract work not specifically covered by the change order)."

The aforementioned "Working Group" had previously found "that the clause is not uniformly construed either by contracting agencies or by Contracting Officers within an agency \* \* \*."

29. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) ; J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965) ; Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963) ; Helene Curtis Indus. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963) ; Leal v. United States, 276 F.2d 378, 149 Ct.Cl. 451 (1960) ; Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct. Cl. 48 (1952) ; Potashnick v. United States, 105 F.Supp. 837, 123 Ct.Cl. 197 (1952) ; Montrose Contracting Co. v. County of Westchester, 80 F.2d 841 (2d Cir. 1936).

30. Cf. Air-A-Plane Corp. v. United States, 408 F.2d 1030, 187 Ct.Cl. 269 (1969) ; Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557 (1961).

31. As required by United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). Plaintiff acknowledges in its brief that "[t]he question of quantum was not submitted to the Board and the hearing was predicated only on the issue of the principles involved."

an extension of time of 419 days, in lieu of the 365 days allowed by the board, there is no support in the record for a finding that plaintiff was delayed for any lesser period than that represented by the suspension of the central feature of this project (the dam) from April 20, 1960 to June 12, 1961. Plaintiff is therefore entitled to the additional claimed extension of 54 calendar days.