ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                    )
                                               )
Gideon Contracting, LLC                        )      ASBCA No. 63561
                                               )
Under Contract No. W912BV-20-D-0041            )
   Task Order No. W912BV-20-F-0139             )

APPEARANCES FOR THE APPELLANT:        Robert L. Magrini, Esq.
                                      Tanner France, Esq.
                                        Hayes Magrini & Gatewood
                                        Oklahoma City, OK

APPEARANCES FOR THE GOVERNMENT:       Michael P. Goodman, Esq.
                                        Engineer Chief Trial Attorney
                                      Stephanie J. Milburn, Esq.
                                        Engineer Trial Attorney
                                        U.S. Army Engineer District, Tulsa

OPINION BY ADMINISTRATIVE JUDGE MELNICK

This appeal is about two suspensions by the Army Corps of Engineers (government) of work on a task order to repair a dam. The contractor, Gideon Contracting, LLC (Gideon), claims the suspensions to release water were for unreasonable lengths of time and seeks compensation. The government demands liquidated damages arising from Gideon's late completion of the contract work. We decide entitlement only, which the parties have submitted for resolution under Board Rule 11.

We rule that Gideon consented to the majority of the first suspension and therefore only three days of it were unreasonable in length. The second suspension was contemplated by the contract and therefore was also not for an unreasonable period, except for seven days that transpired after water releases ceased. We also conclude the government waived its claim for liquidated damages.

FINDINGS OF FACT

1. Pine Creek Lake is impounded by a dam built on the Little River in McCurtain County, Oklahoma. https://www.swt.usace.army.mil/Locations/Tulsa-District-Lakes/Oklahoma/Pine-Creek-Lake/Pertinent-Data/. It is a multipurpose water resource project constructed and operated by the Army Corps of Engineers for the primary purposes of flood control, water supply, water quality, fish and wildlife, and

recreation. Pine Creek Lake Master Plan Final Report, October 2023 at ES-1. https://www.swt.usace.army.mil/Portals/41/docs/lakes/pinecreek/master%20plan/pine_creek_mp_ea_Oct2023.pdf. The lake drains an upstream area comprising 635 square miles. Pine Creek Lake Master Plan Final Report at 1-1, 1-8, 2-20. The primary factor affecting pool elevations is precipitation over the lake and its drainage area (R4, tab 12 at 2). The lake's flood control storage elevation is between 438 and 480 feet (*id.*).

2. On September 19, 2020, the government issued a task order to Gideon for work on the dam under an existing Indefinite Delivery Indefinite Quantity Multiple Award Task Order Contract (MATOC) for civil works and construction (R4, tabs 4n, 5e-5f). The task order activities focused on the dam's splitter wall and a concrete discharge conduit. They included painting, crack injection, patching, and concrete repair. (R4, tab 5e at 2-5) The firm-fixed price was $996,990, and the period of performance was 180 days from the notice to proceed (*id.* at 2-5, 7). The task order contained Federal Acquisition Regulation (FAR) 52.211-12, LIQUIDATED DAMAGES—CONSTRUCTION (SEP 2000), mandating $2,710 in liquidated damages from Gideon for each day it delayed completing the work (R4, tab 5e at 9).

3. The task order specifications included a section entitled "Control of Water" (app. supp. R4, tab 15 at 121). Part 1.5, titled "Flood Emergency Preparation Plan," stated the following:

> Flood conditions may occur that require the Contractor to remove all items from the conduit to allow the Government to release water. The Government begins considering water releases when Pool Elevation reaches 451-ft (NGVD29) and when Pool Elevation reaches 462-ft, water releases must happen. The Government will give the Contractor 72-hr notice to completely remove all equipment from the conduit prior to a release.

(*Id.* at 123) At 460 feet some campsites, structures, parks, and roads adjacent to the lake are affected by flooding (R4, tab 12 at 2). Part 1.5 also required Gideon to "[b]e prepared to move, secure, and protect work areas, equipment, and personnel from flood releases" (R4, tab 15 at 123). Gideon was to submit a Flood Emergency Preparation Plan stating how it would perform these tasks and "[i]mmediately implement the plan upon direction of the Contracting Officer" (*id*). Part 1.6 identified a webpage containing information on the status of the lake and dam, including current inflows, outflows, water level, and gate settings. Another identified webpage provided charts with historical reservoir data. (*Id.*)

2

4.  The underlying MATOC incorporated FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 4n at 9).  Although the clause is well known in the government construction contracting arena, its language is worth repeating here.  It provides in pertinent part:

> (a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.
> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay or interruption, and the contract modified in writing accordingly.  However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

5.  Along with the standard clause located at FAR 52.249-10, DEFAULT (FIXED PRICE CONSTRUCTION) (APR 1984), the MATOC also contained a clause entitled, TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER (OCT 1989) (ER 415-1-15) (R4, tab 4n at 9, 24).  As the name suggests, it establishes the standards for determining extensions of Gideon's time of performance due to weather.

6.  In accordance with Part 1.5 of the water control specifications, Gideon submitted a flood emergency preparation plan, which was approved by the government's project engineer.  It acknowledged the possibility of demobilizations for the release of water, and that in such an event equipment would be removed and personnel evacuated.  (R4, tab 10)

7.  On October 21, 2020, the government issued a notice to proceed, making the initial completion date April 19, 2021 (R4, tab 5g).  Government delays providing a

bulkhead steel support structure to cover one of the dam's gates, obtaining environmental permitting, and addressing regulatory matters, eventually generated Bilateral Modification No. A00003, executed in September 2021. It extended the contract completion date by 22 days and increased the contract price by $49,731. (R4, tab 5i) Weather delays during February 2021 prompted the parties to execute Bilateral Modification No. A00002 in May of that year, extending the contract by eight days (R4, tab 5h). Those two modifications extended the period of performance to May 19, 2021.

8. On March 3, 2021, when the lake level was 447 feet, a government hydraulic engineer briefed Gideon about increases in the lake's pool level resulting from prior snow and ice. They discussed the possibility of a water release. (R4, tab 12 at 3-4, 19) Two days later on March 5, when the lake level was 448 feet, the government decided to perform the release the following week, with Gideon's consent that the lake should be lowered to 438 feet (R4, tab 12 at 4, 12, 19; app. supp. R4, tab 23). It formally ordered Gideon to demobilize from the site and suspend work (R4, tab 1 at 2; app. supp. R4, tab 27).[1] The government started releasing water on March 9 when the lake level was 449 feet (R4, tab 12 at 4, 19). On March 15, the hydrologist stated in an email forwarded to Gideon the lake was expected to be down to 441 feet by March 17. Gideon complained that 438 feet had been previously discussed as a target and requested releases continue until the lake reached that level. (R4, tab 12 at 12-13) The lake fell below 438 feet on March 21 (R4, tab 12 at 19). However, for unknown reasons the government did not end the water release until March 24, and on that day terminated the suspension of work (R4, tabs 1 at 2, 12 at 4). Gideon remobilized on March 25 (R4, tabs 1 at 2, 7a at 562). The delay arising from this suspension of work totaled 20 days from March 5 to 25, 2021.

9. During April 2021, the lake elevation continued to rise. On April 28, the government hydrologist notified Gideon the level was 451.95 feet, the forecast showed several days of rain, and the government planned to start releasing water the following Wednesday, May 5, to drop the level to 438 feet. It was expected to take about two and a half weeks. Accordingly, the government again instructed Gideon to suspend work and demobilize from the conduit by May 5 for the water release. (R4, tabs 1 at 2, 12 at 4, 9 at 48)

10. Gideon began demobilizing May 1, 2021, finished May 4, and on May 5, with the lake level at 460 feet, the government began releasing water (R4, tab 7a at 687, 695, tab 12 at 4). Between May 20 and 25, the government paused releases to avoid flooding downstream areas (R4, tab 12 at 4). By June 7, the lake elevation

---

[1] Both suspension orders discussed here were issued by the project engineer but have been recognized by the contracting officer as effective upon Gideon (R4, tab 1 at 2).

was at 466 feet (R4, tab 12 at 4, 21). On June 8, the government arranged with a downstream water customer to pause all releases long enough to remove a bulkhead blocking one of the dam's gates. With the bulkhead removed on June 12, releases resumed June 14 from both gates, significantly increasing flowage. (R4, tab 12 at 4-5) Nevertheless, lake levels stayed above 460 feet throughout June, which was the measurement on June 30 (R4, tab 12 at 5, 21). On July 7, with the lake still at 450 feet, Gideon notified the government that it should not deviate from its water release schedule. Gideon would return to work when the lake elevation was 438 feet. (R4, tab 12 at 15, 22) On July 12, the lake level had lowered to that level and the releases ceased (R4, tab 12 at 5, 22). The government postponed lifting the suspension of work seven more days, until July 19, because rain was forecasted (R4, tabs 1 at 2, 12 at 5). Managing leaks arising from reinstallation of the removed bulkhead extended full remobilization until August 3 (app. supp. R4, tab 68 at 2; gov't prop. findings ¶¶ 68-69). The delay arising from this suspension of work lasted 94 days, from May 1 to August 3, 2021.

11. The contracting officer (CO) considered the work complete on November 23, 2021 (R4, tab 1 at 3).

12. Rainfall at the dam and in the basin exceeded normal levels between April and June 2021 (R4, tab 12 at 4-5).

13. On September 14, 2021, Gideon submitted a Request for Equitable Adjustment (REA) to the government, dated September 12, seeking to recover for the two sets of delays. It claimed 144 days of excusable delay, 88 of which were compensable in the amount of $331,384.43 in costs. (App. supp. R4, tab 47)

14. On October 5, 2021, the administrative contracting officer (ACO) signed an internal Basic Change Document (BCD) (also signed by the government's project engineer and project manager) approving a contract change. Without explanation, it recognized the government delayed the project for water releases, imposing two suspensions of work for that purpose, justifying 150 days of time extension and $250,000. (App. supp. R4, tab 60 at 3-4)

15. On July 8, 2022, the government responded to the REA. Notwithstanding the prior internal BCD, it cryptically allowed 67 days of non-compensable delay in one sentence and 210 days in another. It recognized one day of compensable time for $4,279.13. (App. supp. R4, tab 11)

16. On October 28, 2022, Gideon submitted a certified claim to the CO seeking a 144-day time extension. It relied upon the Suspension of Work clause to claim 86 of the days were compensable in the amount of $314,138.37. (R4, tab 3) The CO's January 31, 2023, final decision acknowledged Gideon was entitled to the 20 days

5

associated with the first water release, the 94 days associated with the second release, and an additional 30 days claimed to arise from related disruptions, totaling a 144-day extension. However, he denied any compensation. (R4, tab 1 at 6) The 144-day extension would extend the contract completion date to October 10, 2021.

17. The CO's decision also demanded liquidated damages, claiming that after accounting for the additional 144 days, Gideon's November 23, 2021, completion was 44 days late. Applying the liquidated damages clause's $2,710 per day charge, the CO demanded $119,240. (R4, tab 1 at 6-7) There is no evidence the government internally considered, or raised with Gideon, the topic of late completion anytime during performance. There is no evidence that it did so in the immediate period after performance. The government's response to Gideon's REA, over seven months after Gideon completed the contract, recognized Gideon was entitled to additional time and compensation without any mention of late completion or liquidated damages (app. supp. R4, tab 11). The first evidence showing the government considered Gideon's performance to be untimely and that it owed liquidated damages was its decision upon Gideon's certified claim issued over a year after completion (R4, tab 1). Given the government's silence about late completion and liquidated damages for that length of time, we find that prior to the date of the final decision it had already abandoned any concerns that time was of the essence, or interest in collecting liquidated damages.

18. Gideon timely appeals the denial of compensation and the liquidated damages assessment.

## DECISION

Gideon relies upon the suspension of work clause to inconsistently demand either 144-days of compensable delay or 86. *Compare* app. opening br. at 19 with app. prop. findings w. reply br. at 13. It also claims the liquidated damages are punitive and illegitimate. The government responds that it acted reasonably releasing the water. It also maintains the releases were a function of weather which is not its responsibility. It denies that Gideon has any basis to challenge the assessment of liquidated damages for late completion.

### I. Suspensions

Under the Suspension of Work clause, if the CO suspends, delays, or interrupts the work for an unreasonable period of time, "an adjustment shall be made for any increase in the cost of performance of [the] contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly" (finding 4). Thus, it "provides a remedy to a contractor when its work is delayed or interrupted by the Government for an unreasonable period of time." *C&C Plumbing & Heating*, ASBCA No. 44270, 94-3

6

BCA ¶ 27,063 at 134,856. The suspension need not be due to the government's fault to be compensable. *Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 432 (Ct. Cl. 1970). But the delay must have been proximately caused by it. *Granite Constr. Co.*, ASBCA No. 62281, 23-1 BCA ¶ 38,459 at 186,934-95. Whether a suspension is unreasonable in length depends upon its effect upon the contractor and the contract work under the circumstances. *Sol Flores Constr. (A Division of Floresol Co.)*, ASBCA Nos. 31557, 32608, 90-1 BCA ¶ 22,365 at 112,361. Critically though, "[i]f the contract . . . provide[s] for a right to suspend or delay the work for a limited period under particular circumstances, the contracting officer's exercise of such right cannot be deemed unreasonable." *De Matteo Constr. Co. v. United States*, 600 F.2d 1384, 1391 (Ct. Cl. 1979).

The government contends it owes nothing to Gideon because it was not the proximate cause of the suspensions. As the government sees it, the suspensions were caused by the release of water, water falls as rain, and the rain over the dam and basin during some of the relevant months exceeded normal amounts, which is an act of God. The government says that in the event of acts of God the contract only provides for more time under the Default and Adverse Weather clauses, but not compensation. We disagree with the government's characterization of events.

"An act of God is a particularly unusual and unforeseeable event outside the control of the parties." *Manitou Island Transit, LLC v. United States*, 168 Fed. Cl. 218, 226 (Fed. Cl. 2023). It is not something that could have been anticipated and addressed by the contract. *See id.* (citing *Phoenix Bridge Co. v. United States*, 38 Ct. Cl. 492, 509 (1903)). The water releases were not acts of God; they were intended acts of the government in the operation and management of the lake and dam that it built, conducted to reduce flooding fed by water drained from 635 square miles (findings 1, 3, 8-10). Far from unexpected, water releases through the conduit were predicted and addressed by part 1.5 of the water control specifications, which governed their treatment (finding 3). And, as the precise reason for the suspensions, the reasonably anticipated releases were their proximate cause (findings 8-9). *See Paroline v. United States*, 572 U.S. 434, 444 (2014) (finding that generally proximate cause is the requirement for some direct relation between the injury asserted and the conduct alleged).

It was obviously foreseeable that work upon a water conduit in a dam could be interrupted for water releases. Water control specification part 1.5 addressed that contingency, noting that flood conditions could require Gideon to remove all items from the conduit so the government could release water. It precisely dictated when that could happen. The government could only begin considering releases when the pool elevation reached 451 feet, and releases had to occur when the elevation reached 462 feet. The clause required Gideon to establish a plan for accomplishing the equipment removals and for it to be immediately implemented upon the direction of

7

the CO.  (Finding 3)  Gideon's approved flood plan recognized that demobilizations could be ordered (finding 6).

Guided by the contract's provisions, we turn to the first suspension.  On March 5, 2021, when the government ordered Gideon to suspend and demobilize for a water release, the lake elevation was below the 451 feet that the parties contractually established to trigger government consideration of conduit releases (findings 3, 8).  Nevertheless, Gideon approved of the reduction in the lake's level to 438 feet, even reminding the government of that desire on March 15, when the government possibly suggested settling for 441 feet (finding 8).  Given that Gideon desired that reduction in the lake level, we find most of the suspension did not adversely affect it so was not unreasonable.  However, the government inexplicably continued releasing water after it reached 438 feet on March 21, for three more days (*id.*).  In the absence of an explanation for imposing that additional delay and its associated costs upon Gideon, we find it unreasonable.  Gideon is entitled to an adjustment for the increased cost of performance associated with the suspension from March 22 through 24, 2021.

When the government ordered the second suspension on April 28, 2021, the lake elevation was 451.95 feet, above the contract's 451-foot threshold to consider a release (findings 3, 9).  Upon Gideon demobilizing on May 5, the government began releasing water with the lake level at 460 feet (finding 10).  Part 1.5 does not specify when the government was to cease its releases but given the clause's operative goal it is reasonable to expect it to continue until the lake was respectably below 451 feet.  Unfortunately, it took much longer than the two and a half weeks predicted by the government.  Despite the government's removal of the bulkhead blocking the second gate to increase the flow of water, by June 30, the level was still 460 feet.  Notwithstanding the passage of all that time, on July 7, with the level still at 450 feet, Gideon instructed the government it would not return until the elevation was 438 feet.  The government ended the release on July 12, when the elevation reached that level.  (Findings 9-10)  Because the government was permitted by the contract terms to suspend work for this release on April 28, and it ended the release on July 12, when the lake reached the level requested by Gideon, there was nothing unreasonable about the duration of the suspension for this purpose and the remobilization.  *De Matteo*, 600 F.2d at 1391 (explaining that the government's suspension for a specific purpose identified by the contract cannot be deemed unreasonable).  The fact the government paused the release for five days to mitigate downstream flooding does not alter this conclusion (finding 10).  Gideon, which bears the burden of proof, has not shown a five-day halt to mitigate downstream effects of the release was unreasonable.  *See Granite,* 23-1 BCA ¶ 38,459 at 186,934-35.  Nor has it shown that the releases would have ended sooner but for the pause.[2]

---

[2] Gideon also relies upon the ACO's internal BCD recognizing an equitable adjustment in the amount of $250,000, which the government did not ultimately

The one exception we recognize is the government's delay permitting Gideon to return to work after July 12, 2021, until July 19 (finding 10). With the lake elevation finally back on July 12, to its minimum flood control storage elevation of 438 feet after over two months (findings 1, 10), it was unreasonable to continue the suspension based merely upon a forecast of rain, devoid of any other specifics. Accordingly, Gideon is entitled to an adjustment for the increased cost of performance associated with the seven days of suspension from July 13 to 19, 2021. Gideon has failed to demonstrate entitlement to any additional compensation.

## II. Liquidated Damages

Gideon contends the government waived the CO's claim, contained in the January 31, 2023, final decision, for $119,240 in liquidated damages allegedly due because Gideon completed work 44 days late.[3] It says the government only pursued liquidated damages as a punitive response to its claim. We agree.

Although government waiver of completion dates has a more limited application to construction contracts than to supply contracts, waiver has been found when the government's conduct indicated that time was no longer of the essence and that it was not assessing liquidated damages. *See Consorzio Stabile GMG S.c.ar.l*, ASBCA No. 62753, 23-1 BCA ¶ 38,347 at 186,215-16; *ASFA Int'l Constr. Indus. and Trade, Inc.*, ASBCA No. 57880, 14-1 BCA ¶ 35,736 at 174,912. That is precisely what happened here. We have found that, given its silence for over a year after the contract was complete, the government had already abandoned concerns that time was of the essence, or interest in collecting liquidated damages, prior to issuing its claim (finding 17). Accordingly, it has waived its claim for liquidated damages. The government's citation to *OCCI, Inc.*, ASBCA No. 61279, 18-1 BCA ¶ 37,062, for the proposition that Gideon had to advance its own claim to advance its waiver argument, is incorrect. There, the contractor was barred from defending against a government demand for liquidated damages on the ground of excusable delay because it had not submitted such a claim to the CO for an extension of time. Gideon's response to the liquidated damages claim is not premised upon a demand for more time. It simply asserts that the government has waived that claim. A defense of waiver need not first be advanced in a claim. *ASFA*, 14-1 BCA ¶ 35,736 at 174,910-11.

---

grant (findings 14-16). We are not bound to that document's unexplained analysis of the contract. \

[3] The government's brief argues the CO was mistaken and Gideon was actually 75 days late, entitling the government to $202,000.

CONCLUSION

Gideon's appeal from the denial of its claim for compensation is sustained to the extent it is entitled to an adjustment for the increased cost of performance associated with the three days of suspension encompassing March 22 to 24, 2021. It is also entitled to an adjustment for the increased cost of performance associated with the seven days it was suspended encompassing July 13 to 19, 2021. Otherwise, its claim for compensation is denied. Gideon's appeal from the government's assessment of liquidated damages is sustained. The appeal is returned to the parties to address quantum.

Dated: May 12, 2025

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63561, Appeal of Gideon Contracting, LLC, rendered in conformance with the Board's Charter.

Dated: May 13, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

10